# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 01-3193

CHARLA MARTIN, AS SPECIAL ADMINISTRATOR OF
THE ESTATE OF TIMIJANE MARTIN AND PARENT OF
TIMIJANE MARTIN, AND TIMOTHY MARTIN, PARENT
OF TIMIJANE MARTIN,

*Plaintiffs-Appellants,*

v.

SHAWANO-GRESHAM SCHOOL DISTRICT, RICHARD HESS,
WAUSAU UNDERWRITERS INSURANCE COMPANY, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99 C 1313—**Rudolph T. Randa**, *Judge.*

ARGUED FEBRUARY 28, 2002—DECIDED JULY 3, 2002

Before RIPPLE, MANION, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* On May 19, 1999, Timijane Martin,
a 13-year-old seventh grader at Shawano Community Mid-
dle School in Shawano, Wisconsin, was suspended from
school for possessing a cigarette on school grounds. After
returning home at the end of the school day, Timijane com-
mitted suicide. Timijane's parents, individually and on
their daughter's behalf, sued the Shawano-Gresham School
District, the Assistant Principal who suspended Timijane,

and various other school officials, alleging substantive and procedural due process claims, an Equal Protection claim, and supplemental state law claims. The district court granted the defendants summary judgment on the federal claims and dismissed the state claims without prejudice. The Martins appeal, and we affirm.

### I.

In 1999, Timijane Martin was a seventh grader at the Shawano Community Middle School. On the afternoon of the school day on May 19, 1999, some students told the assistant principal at Shawano, Anthony Marinack, that Tabitha Reiter, a friend of Timijane's, had some cigarettes with her at school. Based on this information, Marinack searched Tabitha's locker, where he found a pack of cigarettes. Marinack called Tabitha from class to his office and told her that she would be suspended from school for three days. Marinack then called Tabitha's mother at work and left a message for her regarding Tabitha's suspension.

While in Marinack's office, Tabitha informed him that Timijane also had cigarettes in her locker, hidden in a sock. Marinack then went to Timijane's classroom and called her out into the hallway. He asked her if she had any cigarettes; she claimed that she did not. Marinack and Timijane then walked to her locker, where he again asked her if she had any cigarettes. Once again she denied having any. Marinack then searched her locker, eventually finding a cigarette in a pair of socks located in the side pocket of Timijane's backpack.[1] After he found the cigarette, Timijane began to cry, telling Marinack that she was holding the cigarette for

_____

[1] Also in the locker was a book entitled "After a Suicide," although Marinack stated in his deposition that he did not notice the title of the book while he was searching for cigarettes.

someone else. Marinack told her that she still possessed tobacco on school grounds, which was against school policy, and therefore, she would be receiving a three-day suspension.

Timijane continued to cry as she returned to her classroom to gather her belongings. Several students saw Timijane during this time, and they stated that she was crying pretty hard. Back in his office, Marinack reassured both Tabitha and Timijane that they had been good kids in school and had not been in a lot of trouble before and were not in a lot of trouble now. Despite these reassurances, Timijane continued to cry. Marinack asked Timijane where her parents were and learned that they were working. Timijane told Marinack that her father would be off work the next day, and would come to school to discuss her suspension. While Marinack was talking to Timijane, Tabitha's mother returned Marinack's earlier phone call and informed him that she would pick Tabitha up from school. While Marinack was still on the phone with Tabitha's mother, the 2:30 bell rang, signaling the end of the school day. Marinack asked Timijane if she needed to take the bus home from school, and she replied that she did. Marinack then asked her if she was sure that she did not want him to contact her mother. Timijane repeated that she would take the bus home. Still crying, Timijane left Marinack's office. While waiting to get on the bus she talked to a few classmates, and then took the bus home. After she left for home, Marinack left a message on the Martins' home answering machine alerting them to Timijane's suspension. Tragically, once she arrived home, Timijane went to the basement and hung herself.

Timijane's mother arrived home about 4:00 p.m., but did not discover Timijane at that time. Instead, she heard Marinack's phone message and immediately drove to the

school. Mrs. Martin explained that she first went to the base-ball field because Timijane played recreational softball[2] and she had practice that afternoon. After not finding her there, she drove to the school where she found Marinack in the parking lot. Mrs. Martin and Marinack began discussing Timijane's suspension, but at some point during the conversation, Mrs. Martin asked where Timijane was, and when Marinack told her that she had taken the bus home, Mrs. Martin returned home. She found Timijane in the basement and immediately called 911, but they were unable to save Timijane.

After her death, Timijane's parents sued Anthony Marinack, the Assistant Principal, Jeanne Cronce, the Principal, Richard Hess, the Superintendent, William Matthias, the Assistant Superintendent, the Shawano Community Middle School, and the Shawano-Gresham School District (hereinafter defendants) under Section 1983, alleging both substantive and procedural due process claims, and an Equal Protection claim.[3] The Martins also asserted state law claims of negligence. Following discovery, the defendants moved for summary judgment. The district court granted the defendants summary judgment on the plaintiffs' constitutional claims and dismissed the supplemental state law claims without prejudice. The plaintiffs appeal.

## II.

On appeal, the plaintiffs argue that the district court erred in granting the defendants summary judgment on their sub-

---

[2]  The softball team was not affiliated with the middle school.

[3]  By stipulation, the parties agreed to dismiss William Mathias and the Shawano Community Middle School from the suit.

stantive due process, procedural due process, and Equal Protection claims. Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.56(c). We review the grant of summary judgment *de novo*, considering the evidence in the light most favorable to the non-moving party. *Shanoff v. Illinois Dept. of Human Servs.*, 258 F.3d 696, 701 (7th Cir. 2001).

## A. Procedural Due Process

The Martins first contend that the defendants violated Timijane's procedural due process rights by suspending her without providing parental notice and a hearing prior to the suspension. In *Goss v. Lopez*, 419 U.S. 565 (1975), the Supreme Court held that public school students have a property interest in public education, and thus a right to procedural safeguards. However, under *Goss* students have a right to only minimal process: "[D]ue process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him, and if he denies them, an explanation of the evidence the authorities have, and an opportunity to present his side of the story." *Id.* at 581.

In this case, the undisputed evidence established that the defendants complied with the procedural due process mandates of *Goss*. Specifically, Marinack informed Timijane of the charges against her—possession of a cigarette on school premises—and he allowed Timijane an opportunity to present her side of the story, which she did, explaining that she was holding the cigarette for a friend. However, Timijane did not deny the charge, nor could she, as she was present when Marinack searched her locker and found the cigarette. Marinack then explained to Timijane that

it was irrelevant that she was holding the cigarette for a friend because it was in her locker and school rules prohibit possession of cigarettes on school grounds for any reason.[4]

In response, the Martins argue that due process requires more, citing Section 120.13(1)(B)3 of the Wisconsin Code which provides that "[t]he parent or guardian of a suspended minor pupil shall be given prompt notice of the suspension and the reason for the suspension." Wis. Stat. § 120.13(1)(B)3. They also point to Policy 441 of the Shawano-Gresham School District, which provides:

> Before any disciplinary action such as expulsion or suspension is taken against a student, the student has a right to the due process guaranteed him/her by state law. Any student accused of an action and threatened with punishment for this action shall:
>
> 1. Be advised of the reason for the disciplinary action.
>
> 2. Have the right to explain his/her actions or his/her side of the allegations.

---

[4] On appeal, the Martins point out that the school rules only expressly prohibited the *use* of tobacco on school grounds, not the possession of tobacco. However, they fail to present this as a separate procedural due process claim, or if they intended to, they failed to develop the argument on appeal, and thus have waived it. *Duncan v. State of Wis. Dep't of Health and Family Servs.*, 166 F.3d 930, 934 (7th Cir. 1999) (appellants waive argument by failing to develop argument in briefs on appeal). In any event, the evidence established that the students knew that it was against school rules to have cigarettes on school grounds, and Wisconsin state law also makes it illegal for a minor to possess tobacco. Wis. Stat. § 254.92. Thus, a procedural due process claim based on this argument would fail on its merits.

3.  Have his/her parents(s) or guardian notified if under eighteen and/or living at home; and

4.  Have a right to a hearing before the district administration and/or Board, with the student's parent(s), legal counsel, or guardian present if desired.

The defendants maintain in response that nothing in the language of either Section 120.13(1)(B)(3) or Policy 441 mandates pre-suspension parental notification or a pre-suspension hearing. We need not resolve this interpretative dispute, however, because the failure to conform with the procedural requirements guaranteed by state law does not by itself constitute a violation of federal due process. *Pro-Eco, Inc. v. Board of Comm'rs of Jay County, Ind.*, 57 F.3d 505, 514 (7th Cir. 1995) (a violation of a state procedural statute does not offend the Constitution); *Wallace v. Tilley*, 41 F.3d 296, 301 (7th Cir. 1994) ("The denial of state procedures in and of itself does not create inadequate process under the federal constitution."); *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) ("[A] violation of state law . . . is not a denial of due process, even if the state law confers a procedural right."). Therefore, even if Section 120.13(1)(B)(3) or Policy 441 required more, Timijane cannot state a procedural due process claim based on the alleged failure to conform to state law. And as set forth above, the Supreme Court has held that in the context of a short-term suspension, only minimal due process is required under the U.S. Constitution, and the undisputed evidence established that the school provided that requisite process.

The Martins also point to the Student Handbook which provides: "Parents will be notified of disciplinary action resulting in an out-of-school suspension and will be expected to pick up their child from school following the notification." While the Martins contend that this provision re-

quired the school to detain Timijane after school hours, we believe a more logical reading of this provision, however, is the reading Marinack gave it, namely that parents are expected to pick their child up if the suspension occurs during the school day. In any event, as just noted, the failure to comply with state procedural rules cannot form the basis for a federal constitutional claim. *See supra* at 7. Therefore, we conclude that the Student Handbook cannot form the basis for a procedural due process claim.

In sum, while the U.S. Constitution requires a school which suspends a student to provide that student with due process, the process required is minimal. *Goss,* 419 U.S. 565. The undisputed facts in this case demonstrate that the defendants complied with the constitutional mandates by notifying Timijane of the basis for the disciplinary action and an opportunity to provide her side of the story. The Constitution does not require pre-suspension parental notification or a pre-suspension hearing. Moreover, even if state law required more than the Constitution, that cannot form the basis of a federal due process claim.[5]

## B. Substantive Due Process

Next, the Martins claim that the defendants violated Timijane's substantive due process rights by suspending her from school, thereby causing her severe emotional distress, and then by failing to affirmatively protect Timijane from that distress. This, according to the Martins, caused her to

---

[5]   In addition to pursuing a procedural due process claim on behalf of Timijane, the Martins claim that their procedural due process rights were also violated. However, as discussed above, the defendants provided all of the process required under the Constitution, so the Martins' independent claim fails as well.

commit suicide. To address Timijane's substantive due process claim, we start with *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 195 (1989), which sets forth the basic law concerning substantive due process claims against state actors in this situation.

In *DeShaney*, despite strong evidence that Joshua De-Shaney's father was physically abusing him, the county social services agency returned the four-year-old to his father's custody. *Id.* at 192. After he was returned to his father, the assigned case worker noticed more suspicious injuries, and emergency room physicians continued to call Child Protective Services about injuries to Joshua, but the state failed to remove him or to take other actions to protect him. *Id.* Joshua's father eventually beat his son so severely that Joshua suffered permanent brain damage, leaving him severely retarded and likely to spend the remainder of his life in an institution. *Id.* at 193. Following the beating, Joshua sued the state agencies and individuals responsible for the decision to return him to his abusive father, alleging that the defendants violated Joshua's substantive due process rights. *Id.*

The Supreme Court in *DeShaney* held that even though the defendants suspected ongoing abuse, they had not deprived Joshua of his right to due process because the Due Process Clause's "purpose was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 195-96. As the Court explained, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.* at 195. Thus, the Due Process Clause "forbids the State itself to deprive individuals of life, liberty, or property without

'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.*

While *DeShaney* concluded that the Due Process Clause does not generally require the state to act affirmatively to protect people from harm from private actors, *DeShaney* also recognized that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198. Since the Supreme Court rendered its decision in *DeShaney*, this circuit has recognized two such "limited circumstances": "One exists if the state has a special relationship with a person, that is, if the state has custody of a person, thus cutting off alternate avenues of aid. The other is the state-created danger exception." *Monfils v. Taylor*, 165 F.3d 511, 515 (7th Cir. 1998) (internal citations omitted). On appeal, the Martins do not claim that the defendants had a special custodial relationship with Timijane, rather, they rely on the "state-created danger" exception.[6]

In *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993), we summarized the "state-created danger" exception stating "that plaintiffs . . . may state claims for civil rights violations if they allege state action that created, or substantially contributes to the creation of, a danger or renders citizens more

---

[6] This and three other circuits have generally rejected the idea that a school has a "special custodial relationship" with a student for purposes of the *DeShaney* exception. *See J.O. v. Alton Comm. Unit Sch. Dist. 11*, 909 F.2d 267, 272-73 (7th Cir. 1990); *Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 569 (11th Cir. 1997); *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 732 (8th Cir. 1993); *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1370-73 (3d Cir. 1992).

vulnerable to danger [than] they otherwise would have been." *Id.* at 1126. Based on this language, the Martins argue that they can succeed on a substantive due process claim because the defendants either created the risk that Timijane would commit suicide, or rendered Timijane more vulnerable to the risk of suicide by suspending her from school.[7] Because the school created or increased the danger, the Martins argue, substantive due process required the defendants to take affirmative steps to protect Timijane, by, for instance, providing her with counseling or holding her at school until her parents could pick her up.

While there is no case law in this circuit directly on point, *Collignon v. Milwaukee County*, 163 F.3d 982 (7th Cir. 1998), provides a helpful analogy. In *Collignon*, 28-year-old Jonathan Collignon committed suicide after being released from police custody. Following his death, Jonathan's estate

---

[7] The defendants argue that the risk that Timijane would commit suicide existed before her suspension. After Timijane's death, the school learned that prior to her suspension, Timijane had discussed committing suicide in three letters to Tabitha, and in one or two telephone calls with Tabitha. Also, on the day of her death, Timijane told Tabitha at lunch that she felt like hanging herself because a former boyfriend had given her a dirty look and because she felt "ugly and stupid and fat" and was unable to "get a boyfriend." Unfortunately, Tabitha did not tell the school or Timijane's parents of these conversations until after her death. While this evidence indicates that there was a risk of suicide prior to the suspension, and thus the school did not *create* the risk, the "state-created danger" exception may also apply if the state increased a risk or danger, which the Martins claim the suspension did in this case. *Stevens v. Umsted*, 131 F.3d 697, 704-05 (7th Cir. 1997) (*DeShaney* "state-created" exception applies if the state "creates the danger *or renders a person more vulnerable to an existing danger*.") (emphasis added).

sued the police officers and others involved, claiming that the defendants had violated Jonathan's substantive due process rights by releasing him from custody over the objections of Jonathan's father and stepmother, who had pleaded with the police department to retain custody of Jonathan and obtain medical treatment for his paranoid schizophrenia. Relying on *DeShaney*, this court first held that "the plaintiffs cannot base their claims on the assertion that [the defendants] had an obligation to stop Jonathan from committing suicide once he had been released from the jail." *Id.* at 987. We further concluded that "the plaintiffs cannot claim that the County defendants should have involuntarily committed Jonathan to a mental health facility: Due process protects people from being unlawfully restrained; it provides no right to be restrained, lawfully or otherwise." *Id.*

This court then considered whether the state had increased the risk to Jonathan. The plaintiffs in *Collignon* had argued that by seizing Jonathan and then detaining him, the defendants had increased the risk that he would commit suicide. *Id.* at 992. Therefore, according to the plaintiffs, "the due process clause require[d] the state to protect him to the extent of ameliorating the incremental risk." *Id.* This court rejected that argument, concluding that while "[i]t is certainly possible that custody, even when quite temporary, is stressful for mentally ill persons like Jonathan, . . . temporarily detaining someone in Jonathan's situation does not expose him to an 'incremental risk' that must then be ameliorated." *Id.*[8]

---

[8] In *Collignon*, this court noted that the police actually reduced the risk Jonathan faced because he was released to his parents, whereas prior to his arrest he was wandering the streets. *Id.* at

(continued...)

As noted in *Collignon*, "[d]ue process protects people from being unlawfully restrained; it provides no right to be restrained, lawfully, or otherwise." *Id.* at 991. Thus, the Martins' general claim that the defendants violated Timijane's substantive due process rights by allowing her to return home at the end of the school day cannot succeed. The Martins' reliance on the "state-created" danger exception of *DeShaney* also falls short. In *Collignon*, the state did not create or increase the risk of suicide by arresting Jonathan, even where the arrest caused severe emotional distress. So too, here the school did not create or increase a risk to Timijane by suspending her from school, even if that action caused severe emotional distress.

On appeal, the plaintiffs also argue at length that the defendants should have known that Timijane was at risk to commit suicide. First, they claim that Marinack should have been aware of Timijane's extreme distress because she was crying hysterically.[9] They also claim that Marinack

---

[8] (...continued)
992. But that fact does not change the basic conclusion of *Collignon* that temporarily detaining someone, even if it causes mental distress, does not "increase the risk" of harm within the meaning of *DeShaney*, necessitating state affirmative action. *Id.*

[9] The defendants challenge the Martins' description of Timijane as hysterical, pointing to testimony by Marinack that while at times she was crying pretty hard, she was not crying constantly, and she was also composed enough to ask questions about how she could obtain her homework assignments. Marinack also stated that he believed that Timijane's reaction to her suspension was normal for a middle school student in that situation who had not been in a lot of trouble before. Marinack also stated that if a student's reaction to discipline was out of proportion to a particular situation, he would involve the school psychologist, social

(continued...)

must have seen the book entitled "After a Suicide" in Timijane's locker during the search, and therefore should have known that Timijane was at risk to commit suicide. Additionally, the Martins claim that previous suicides by other students and a district principal should have put the defendants on notice of the risk of suicide. However, whether or not that evidence should have put the defendants on notice that Timijane was at risk, the Constitution does not require the school to act affirmatively in the ways the plaintiffs claim (providing her with counseling after school hours or keeping her at school after hours until her parents could pick her up), unless the state created or increased the danger in the first instance. Here the defendants did not create or increase the risk that Timijane would commit suicide, and therefore they did not have an affirmative obligation to protect Timijane after school hours. The alleged knowledge of her fragile emotional state is irrelevant for purposes of the due process clause.[10]

---

[9] (...continued)
worker or guidance counselor. However, for purposes of this motion, we must view the facts in the light most favorable to the plaintiffs.

[10] The plaintiffs' focus on the defendants' knowledge of the risk to Timijane would be relevant to the question of "deliberate indifference." However, because we conclude that the defendants did not create or increase the risk of suicide by suspending Timijane, we need not reach the question of whether the defendants acted with deliberate indifference, which would be necessary to create constitutional liability. *See Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998). However, even assuming that Timijane was distraught after her suspension and that Marinack saw the title of the book "After a Suicide" in her locker, that would not be enough to demonstrate that the defendants had a

(continued...)

The Martins respond by citing *Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253 (10th Cir. 1998). In *Armijo*, sixteen-year-old Philadelfio Armijo, a special education student at Wagon Mound Public Schools, committed suicide after being suspended from school and driven home without parental notification. After Philadelfio's death, his parents sued the school district and various school officials alleging that the defendants violated Philadelfio's substantive due process rights. The district court denied the defendants summary judgment, and the Tenth Circuit affirmed, applying the "state-created danger" exception to *DeShaney.* The Tenth Circuit explained that "[t]he key to the state-created danger cases . . . lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, . . ." *Id.* at 1263 (quoting *Johnson v. Dallas Ind. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994)). To be liable, the Tenth Circuit continued, "the environment created by the state actors must be dangerous; they must know it is dangerous; and, . . . they must have used their authority to create an opportunity that would not otherwise have existed for the third party's [acts] to occur." *Armijo*, 159 F.3d at 1263 (quoting *Johnson*, 38 F.3d at 201). Applying this standard, the Tenth Circuit concluded that the school created a dangerous condition by

---

[10] (...continued)
"conscious disregard of [a] known or obvious danger," *id.*, that Timijane would return home that afternoon and kill herself. The defendants had no knowledge that Timijane had threatened suicide in the past, and there is no evidence that she had threatened suicide in the presence of Marinack or other school officials. *Compare Armijo*, 159 F.3d at 1257 (school may be liable for student's suicide where the school sent the student home during school hours and after he had told a school aide that "I'd be better off dead").

suspending Philadelfio, which caused him to become distraught and to threaten violence, and then taking him to his home and leaving him alone where at least some of the defendants knew that he had access to firearms and that he had threatened suicide in the past.

Even if we were to accept the *Armijo* standard that the school created a danger and thus could be liable under *DeShaney*, the Martins' argument would still not succeed. The Martins have not shown that the school defendants "used their authority to create an opportunity that would not otherwise have existed for the third party's [acts] to occur." *Id.* at 1263. Rather, the school relinquished control of Timijane at the end of the school day, just as it would have done had she not been suspended.[11] Conversely, in *Armijo*, the court concluded that the school created a risk that otherwise did not exist by removing Philadelfio from school during school hours, driving him home, and then leaving him there alone in the middle of the school day. In that case, it was not the suspension that created a risk to the child, but the school's affirmative act of taking the student home alone during the middle of the school day. No such evidence of an affirmative act was presented here.

The First Circuit's decision in *Hasenfus v. LaJeunesse*, 175 F.3d 68 (1st Cir. 1999), illustrates the limited application of *Armijo*. In *Hasenfus*, the parents of 14-year-old Jamie Hasenfus sued the Winthrop Middle School and others

---

[11] The Martins point out that Timijane was supposed to have gone to softball practice (for a community team, as opposed to a school team) after school, as opposed to taking the school bus home. There is absolutely no evidence that the defendants knew this, and in fact the evidence indicates that Timijane told Marinack the exact opposite—that she was supposed to take the school bus home.

after their daughter attempted to kill herself at school. Jamie had tried to commit suicide after she was reprimanded in front of her classmates by a teacher during a physical education class and then sent back into the locker room. "No one from the school staff was supervising the locker room. After returning to the locker room, Jamie tried to hang herself." *Id.* at 70. Classmates found Jamie before she died, but she went into a coma and, even after waking up, spent several weeks in the hospital and suffered permanent injuries. *Id.* The First Circuit concluded that the defendants could not be liable for violating Jamie's substantive due process claims, distinguishing *Armijo. Id.* at 74. First, the court noted that whether or not it agreed with the Tenth Circuit, the facts in *Armijo* were very troubling. Specifically, the Tenth Circuit noted that in *Armijo*, the school sent the student home during the school day, even though the school officials knew that the student, who was a special education pupil not fully able to care for himself, had previously threatened suicide, and that he had access to a firearm at home. *Id.* In contrast, the court in *Hasenfus* explained, there was no evidence that Jamie had threatened to kill herself then or at any other time, and it did not send her home alone during the school day. *Id.*

This case is even more removed than *Hasenfus*. In this case, like in *Hasenfus*, there was absolutely no evidence that the school authorities knew that Timijane had threatened suicide at any time. But here, unlike Jamie Hasenfus, Timijane did not attempt suicide during school hours or on school premises. Thus, the plaintiffs can only succeed if they establish that the school had a duty to protect Timijane from suicide *after* the school day ended. But as *Hasenfus* recognized, "the primary responsibility for safeguarding children from this danger, as from most others, is that of their parents; and even they, with direct control and intimate knowledge, are often helpless." *Id.* at 73. Because the de-

fendants did not create or increase a risk that Timijane
would commit suicide by suspending her and then allow-
ing her to return home at the end of the school day, the
Martins' substantive due process claim must fail.


## C.  Equal Protection Claim

Finally, the plaintiffs contend that the defendants vio-
lated Timijane's rights under the Equal Protection clause.
Specifically, the Martins (on Timijane's behalf) contend
that, even though Timijane and Tabitha were similarly situ-
ated, they were treated differently in two ways: First, while
Marinack directly contacted Tabitha's mother at work
and gave her the opportunity to pick Tabitha up at school,
Marinack never tried to contact Timijane's parents at work
to give them the same opportunity. Second, the Mar-
tins claim that Marinack punished Timijane more severely
than Tabitha by not only suspending her for three days but
by also ordering Timijane to miss the first three volleyball
games of the next season and a field trip.

Typically, an equal protection claim focuses on the denial
of a fundamental right or disparate treatment of persons
depending on the claimant's suspect classification. We
examine such claims under a more exacting strict scrutiny
test, while other equal protection claims are examined under
the deferential rational basis test. *David K. v. Lane*, 839 F.2d
1265, 1270 (7th Cir. 1988). Timijane's Equal Protection claim
involves neither. Not only is she not in a suspect class, but
the right to education is also not considered a fundamental
right. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1,
33-34 (1973). Nonetheless, the Supreme Court has held that
an individual may state a "class of one" equal protection
claim if she has "been intentionally treated differently from
others similarly situated and that there is no rational basis

for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (internal quotations omitted).[12] This is because "the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Id.*

The question remains then as to whether Marinack had a rational basis for treating Timijane and Tabitha differently. Marinack explained that he called Tabitha's mother at work because he had discovered the cigarettes in Tabitha's locker first and earlier in the school day. However, by the time he had searched Timijane's locker and had her in his office the school day was almost over. Marinack further explained that he kept Tabitha at school because her mother had returned his earlier phone call. On the other hand, the dismissal bell rang before Marinack had contacted Timijane's parents, and while he was still discussing her suspension. As Marinack explained in his deposition, he asked Timijane if she had to take the bus home and she said that she did. Marinack then asked her if she wanted him to call her mother, but she again said she would take the bus home. Under

---

[12] On appeal, the Martins also contend that Timijane's Equal Protection claim requires strict scrutiny because it is based on the denial of the fundamental right to family relations. The right to familial relations is a fundamental right protected by the Constitution. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). However, the alleged violation of Timijane's rights—the disparate treatment in her discipline—does not implicate the right to familial relations. The right to familial relations concerns the family relationship, not school disciplinary matters. Therefore, we conclude, as the district court did, that her claim is judged under the rational basis test.

these circumstances, and in light of the different timing involved, Marinack's differing treatment of Tabitha and Timijane was rational.[13]

The Martins also claim that Timijane was treated more severely than Tabitha because in addition to a three-day suspension, Marinack ordered her to miss the first three volleyball games of the next season and a field trip. Marinack testified in his deposition that he did not order Timijane to miss the volleyball games or the field trip, and that he only suspended her for three days, just like he did with Tabitha. To support their claim, Mrs. Martin points to her affidavit in which she attested that Marinack told her in the school parking lot that he had ordered Timijane to miss the first three volleyball games next season and a school field trip. The district court, however, struck that affidavit because it contradicted her deposition testimony. While the Martins do not challenge that evidentiary ruling on appeal, they do claim that there was other evidence that Timijane was punished in this manner. Specifically, the Martins point to Mr. Martin's deposition testimony in which he said that he understood from Mrs. Martin that Timijane was also suspended from three volleyball games the following year. However, to the extent that Mr. Martin is repeating what his wife told him, that evidence is inadmissible hearsay. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). To the extent Mr. Martin testified as to his "understanding," he lacked personal knowledge as to the punishment ordered, and as such that evidence is inadmissible, and thus cannot create a factual issue. *Gusto-*

---

[13] To the extent the Martins are pursuing an Equal Protection claim on their own behalf for this same differing treatment, that claim also fails because Marinack had a rational reason for contacting Tabitha's mother but not Mrs. or Mr. Martin.

*vich v. AT&T Comm., Inc.*, 972 F.2d 845, 849 (7th Cir. 1992). The Martins also rely on testimony from a classmate of Timijane who stated that after her suspension Timijane said that she felt it was unfair that Tabitha's penalty was more lenient. This also constituted hearsay, and even if it were admissible, the classmate's statement does not contradict Marinack's testimony that he did not order Timijane to miss the three volleyball games and a field trip. Moreover, to be liable, the defendants would have had to have acted with deliberate indifference in meting out the differing punishments, but there is insufficient evidence to support that finding. *See Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 951 (7th Cir. 2002). Therefore, the defendants were entitled to summary judgment on Timijane's Equal Protection claim.

## III.

The tragedy of suicide, especially of a young person, cannot be overstated—it is the loss of a precious life. It leaves everyone questioning how it could happen and how it could have been prevented, and it is understandable that the Martins look to the school in their search for answers. But notwithstanding their anguish and the tragedy of Timijane's death, the defendants did not violate either Timijane's or the Martins' constitutional rights,[14] so we must AFFIRM.

---

[14] Because we conclude that the facts fail to support a constitutional claim, we need not reach the question of qualified immunity or whether the school district had a custom or policy creating municipal liability. *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982); *Monell v. Department of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*