In the
# United States Court of Appeals
## For the Seventh Circuit

No. 07–3315

MONET WILLIAMS, *et al.*,

*Plaintiffs-Appellants*,

*v.*

WALTER V. WENDLER, *et al.*,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Illinois.
No. 05–cv–4157–JPG—**J. Phil Gilbert**, *Judge*.

_____

ARGUED FEBRUARY 29, 2008—DECIDED JUNE 23, 2008

_____

Before POSNER, ROVNER, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiffs in this civil rights suit under 42 U.S.C. § 1983 are three black female students at Southern Illinois University, a state university, who were suspended by the university, one for two years and the other two for three years, for hazing another black female student, who was pledging the plaintiffs' sorority, Zeta Phi Beta.

The university defines hazing as "any action required of or imposed on current or potential members of a group which produces or is reasonably likely to produce bodily

harm, humiliation or ridicule, substantial interference with academic efforts, or significant impairment or endangerment of physical well-being, regardless of the consent of the participants," and suspension for up to three years is authorized as a sanction. "Student Conduct Code," www.siu.edu/~policies/policies/conduct.html, visited May 27, 2008. The sorority itself has an anti-hazing policy. "Zeta Phi Beta Sorority Incorporated Official Statement Against Hazing," www.zphib1920.org/policy/antihazing.html, visited May 27, 2008.

The plaintiffs beat the pledge repeatedly with paddles over a four-day period, bruising her buttocks so severely that it was painful for her to sit, and forced her to dive knee first barelegged into rice, which was also painful. She dropped out of the pledge process and complained to university authorities, who instituted the internal administrative proceeding that resulted in the suspensions.

The plaintiffs contend that the suspensions violate Title VI of the Civil Rights Act of 1964, which forbids racial discrimination by recipients of federal grants, 42 U.S.C. § 2000d; *Brewer v. Board of Trustees*, 479 F.3d 908, 921 (7th Cir. 2007), and also the equal protection and due process clauses of the Fourteenth Amendment. The district judge granted summary judgment in favor of the defendants (officials of the university sued in their personal capacity) on the discrimination claims and dismissed the due process claim under Rule 12(b)(6).

The Title VI and equal protection claims are identical: they are that the university punished the plaintiffs more severely than if they had been white. Neither party differentiates between Title VI and equal protection. That is a mistake, though an inconsequential one in this case. When

Congress enacts a comprehensive scheme for enforcing a statutory right that is identical to a right enforceable under 42 U.S.C. § 1983, which creates a civil remedy for violations of federal rights (including constitutional rights) under color of state law, the section 1983 lawsuit must be litigated in accordance with the scheme. That is the doctrine of *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 20-21 (1981); see also *Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418, 423-29 (1987); *Blessing v. Freestone*, 520 U.S. 329, 346-48 (1997); *Delgado v. Stegall*, 367 F.3d 668, 672-75 (7th Cir. 2004). It is not mentioned by the parties to this case or by the district court, although the Supreme Court held in *Regents of University of California v. Bakke*, 438 U.S. 265, 287 (1978), that "Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." (This part of Justice Powell's opinion commanded a majority. See *id*. at 325 (separate opinion).) So the plaintiffs had nothing substantive to gain by joining an equal protection claim to their Title VI claim. And, by virtue of the *Sea Clammers* doctrine, had they failed to comply with the procedures required by Title VI they could not have recouped by pointing to their equal protection claim. But no matter; for in any event the evidence of racial discrimination is insufficient to create an issue for trial.

In a typical case of racial discrimination a person of one race loses out in a competition with someone of another race, as when a black person is fired and replaced by a white (or, occasionally, vice versa). In this case, three blacks hazed another black. The university authorities were not choosing between black and white in punishing the hazers, but between black and black, which is like

choosing between white and white. There can, it is true, be "racial" discrimination within the same race, broadly defined, because "race" is a fuzzy term, as we noted in *Abdullahi v. Prada USA Corp.*, No. 07-2489, 2008 WL 746848, at *1-2 (7th Cir. Mar. 21, 2008); see *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 609-13 (1987); *Holcomb v. Iona College*, 521 F.3d 130, 138-39 (2d Cir. 2008). We were speaking in *Abdullahi* of "race" as understood in 1866, when 42 U.S.C. § 1981 was enacted, and Title VI of course is much more recent. But "race" remains fuzzy. Moreover, Title VI, like Title VII, forbids discrimination on the basis of "color" as well as on the basis of "race." Light-skinned blacks sometimes discriminate against dark-skinned blacks, and vice versa, and either form of discrimination is literally color discrimination. *Walker v. Secretary of the Treasury*, 713 F. Supp. 403, 405-08 (N.D. Ga. 1989), aff'd without opinion, 953 F.2d 650 (11th Cir. 1992); cf. *Rodriguez v. Gattuso*, 795 F. Supp. 860, 865 (N.D. Ill. 1992). But there is no suggestion of that in this case.

Still, if as the plaintiffs claim the university systematically treats black hazing more unforgivingly than white hazing, then, even if the result is to give black pledges more protection than white ones, the differential treatment would be actionable because it would be discrimination against black hazers on account of their race; discriminating against a person on the basis of his race is not offset by discriminating in favor of other persons of the same race. Cf. *United Automobile Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 197-200 (1991); *Norman-Bloodsaw v. Lawrence Berkeley Laboratory*, 135 F.3d 1260, 1272-73 (9th Cir. 1998); *Larkin v. Michigan Department of Social Services*, 89 F.3d 285, 289-91 (6th Cir. 1996). Even if black sororities or fraternities were found to treat their pledges worse than white ones do, see Peter Applebome, "Lawsuit

Shatters Code of Silence Over Hazing at Black Frater-
nities," *New York Times* (Dec. 21, 1994), http://
query.nytimes.com/gst/fullpage.html?res=
9801EFDB1038F932A15751C1A962958260, visited June 3,
2008; *State v. Brown*, 630 N.E.2d 397, 399-400 (Ohio App.
1993), this would not justify a rule that black hazers are
to be punished more severely than white ones. (By "black"
sorority we mean one the membership of which is primar-
ily or even exclusively black. See, e.g., *EEOC v. Target Corp.*,
460 F.3d 946, 951-52 (7th Cir. 2006); *Lloyd v. Alpha Phi Alpha
Fraternity*, Nos. 96-CV-348, 97-CV-565, 1999 WL 47153, at
*11 (N.D.N.Y. Jan. 26, 1999); Walter M. Kimbrough, *Black
Greek 101: The Culture, Customs, and Challenges of Black
Fraternities* (2004). Zeta Phi Beta was said in *Boy Scouts of
America v. Till*, 136 F. Supp. 2d 1295, 1304 (S.D. Fla. 2001),
to limit its membership to blacks, but "Whites in
Black Sororities and Fraternities," *Ebony* (Dec. 1, 2000),
www.encyclopedia.com/doc/1G1-67531419.html, visited
June 2, 2008, states the contrary.) A system of race-neutral
punishments graded by the severity of the offense would
automatically punish the worst violators more heavily
than other violators.

The plaintiffs point to two instances of lenient treatment
of white hazers. In one, a fraternity pledge who had tied
another pledge to a tree received a one-year suspension
later reduced to a year's probation. In the other and
more serious incident a pledge drowned accidentally
during a fraternity-sponsored camping trip. He had been
drinking. The fraternity was found to have violated the
university's drinking and safety rules, and was perma-
nently banned from the university. There was no evidence
of hazing on the camping trip, and no members of the
fraternity were punished.

The plaintiffs argue that disciplining blacks more
harshly than whites for offenses of similar gravity is

evidence of racial discrimination, and that is true, as many cases hold. E.g., *Crawford v. Indiana Harbor Belt R.R.*, 461 F.3d 844 (7th Cir. 2006); *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853-54 (8th Cir. 2005); *Maynard v. Board of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003). But all the cases we have found are employment cases. Usually the employer has a number of employees and a set schedule of punishments, culminating in dismissal, and often the types of conduct that violate the employer's rules fall into a few well-defined classes of misconduct, such as absenteeism, harassing or endangering other workers, disobeying orders, failing to meet minimum performance standards, drug taking, or stealing. So if in some class of rule violators blacks are punished on average more severely than whites, especially if the same supervisor made the disciplinary decisions, that is evidence of racial discrimination, though the employer may be able to rebut it by showing that the blacks were punished more severely for proper reasons. E.g., *Flores v. Preferred Technical Group*, 182 F.3d 512, 515-17 (7th Cir. 1999); *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 930-32 (7th Cir. 1993); *Silvera v. Orange County School Board*, 244 F.3d 1253, 1258-60 (11th Cir. 2001). The problems when hazing or other activity that endangers fraternity or sorority pledges gives rise to a claim of racial discrimination are, first, that the activity takes heterogeneous forms, and, second (but partly related to the first point), that there is no uniform schedule of punishments. Is hazing, a form of deliberate misconduct, less censurable than carelessness with regard to alcohol and risk management? And is permanently banning an entire fraternity from campus forever a milder punishment than suspending three members of a sorority for two or three years? More individuals are "punished" in the first case, but less severely, so the net balance is unclear. (We do assume,

however, that punishments by sororities and fraternities could be compared, at least if the misconduct punished were similar and the two Greek societies were in the same university.)

That leaves, for possibly meaningful comparison with the incident in this case, just the pledge tied to a tree. The victim, though smeared with ketchup and mud while duct-taped naked to a tree, was not hurt physically, as the victim of the plaintiffs in the present case was, and did not complain. The victimizer, moreover, was another pledge rather than a member of the fraternity, and so maybe less culpable for his dumb behavior.

Moreover, three cases is an inadequate sample on which to base an inference of discrimination when the cases are dissimilar. In a large number of dissimilar cases, if there were reason to think the dissimilarities were randomly distributed and therefore canceled out, an inference of discrimination might be drawn. And likewise in a small sample if the cases were identical except for a racial difference. But in a very small sample of dissimilar cases, the presence of a racial difference does not permit an inference of discrimination; there are too many other differences, and in so small a sample no basis for thinking they cancel out.

The plaintiffs' due process claim, to which we now turn, is that the disciplinary procedures employed by the university in this case, though elaborate, were a sham. It is unclear what the plaintiffs mean by "sham," other than that they should have received a lighter punishment. But their claim fails regardless of the adequacy of the procedures.

To have a due process claim you must show that you have been deprived of a property right. The plaintiffs claim

that they have a property right in a college education, more specifically in a college education at Southern Illinois University, since they do not argue that they cannot enroll elsewhere; in fact one of them has enrolled elsewhere. A college education—any education—is not "property" in the usual sense of the word. But the Supreme Court has read the word "property" in the due process clauses of the Fifth and Fourteenth Amendments to include pretty much any legally protected entitlement, such as a job that carries with it tenure, e.g., *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576-78 (1972), which means that you can be fired only for cause; or a license that can't be yanked except for cause, *Barry v. Barchi*, 443 U.S. 55, 64 (1979); or, coming closer to this case, a public high school education. *Goss v. Lopez*, 419 U.S. 565 (1975); see also *Martin v. Shawano-Gresham School District*, 295 F.3d 701, 705-06 (7th Cir. 2002); *Shuman ex rel. Shertzer v. Penn Manor School District*, 422 F.3d 141, 149 (3d Cir. 2005).

The plaintiffs' problem in this case, and the justification for the district court's dismissing their due process claim without awaiting the presentation of evidence, is that they premise the claim entirely on the bald assertion that any student who is suspended from college has suffered a deprivation of constitutional property. That cannot be right. And not only because it would imply that a student who flunked out would have a right to a trial-type hearing on whether his tests and papers were graded correctly and a student who was not admitted would have a right to a hearing on why he was not admitted; but also because the Supreme Court requires more. It requires, as we know, proof of an entitlement, though it can be a qualified entitlement (most entitlements are), in this case an entitlement not to be suspended without

good cause. That is a matter of the contract, express or implied, see *Johnson v. Lincoln Christian College*, 501 N.E. 2d 1380, 1384 (Ill. App. 1986), between the student and the college. *Galdikas v. Fagan*, 342 F.3d 684, 691-92 (7th Cir. 2003), overruled on other grounds by *Spiegla v. Hull*, 371 F.3d 928, 941-43 (7th Cir. 2004); cf. *Deen v. Darosa*, 414 F.3d 731, 733-36 (7th Cir. 2005); *Indiana Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 708-10 (7th Cir. 2004); *Johnson v. City of Fort Wayne*, 91 F.3d 922 (7th Cir. 1996). That is the difference between college and high school; a high school student's rights will usually be defined by statute. See, e.g., 105 ILCS 5/10-22.6, 5/26-12.

Suppose a student had a contract with the college in which he promised to pay tuition, in an amount specified by the college, on the first day of each quarter, and in exchange the college promised not to suspend him unless he hazed another student. The contract would create an entitlement, so that if the college suspended him for hazing and he denied it he would be entitled to a hearing. There is no suggestion of such a contract in this case because the plaintiffs, while calling their claim a "property" claim, deny that they need to establish an *entitlement*—an enforceable right—and not merely an entitlement to fair procedure, as that would dissolve the requirement of showing a deprivation of life, liberty, or property as a precondition to complaining about a denial of due process. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541 (1985). They have denied themselves out of court.

AFFIRMED.