In the

# United States Court of Appeals
## For the Seventh Circuit

————————

No. 13-2081

GERALD CHARLESTON,

*Plaintiff-Appellant,*

*v.*

BOARD OF TRUSTEES OF THE UNIVERSITY
OF ILLINOIS AT CHICAGO, *et al.*,

*Defendants-Appellees.*

————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-09463 — **Suzanne B. Conlon**, *Judge.*

————————

ARGUED NOVEMBER 6, 2013 — DECIDED DECEMBER 20, 2013

————————

Before WOOD, *Chief Judge*, and FLAUM and TINDER, *Circuit Judges*.

FLAUM, *Circuit Judge*. Gerald Charleston, a former medical student, brought this § 1983 action after the University of Illinois College of Medicine dismissed him for unprofessional conduct. Charleston advances procedural due process, substantive due process, and equal protection claims against the university, its administrators, and his clinical instructors.

The district court dismissed his constitutional claims at the Rule 12(b)(6) stage. It found that Charleston did not plead sufficient facts to establish that he had a protected property interest in his continued education at the medical school, nor to demonstrate that the university singled out Charleston for unfavorable treatment. We affirm.

## I. Background

We assume the following facts, taken from Charleston's complaint, to be true. In fall 2010, Charleston was beginning his fourth year at the University of Illinois College of Medicine at Chicago. He had finished his Obstetrics and Gynecology clinical rotation the previous June. But in September, two of Charleston's preceptors, Dr. Ralph Kehl and Dr. Nancy Wozniak, submitted a complaint to the College of Medicine asking that Charleston be required to repeat the rotation. Kehl and Wozniak's complaint alleged that Charleston had committed errors in his written work (including plagiarism in his patient histories and other reports), that he did not complete his quizzes until one week after the rotation's conclusion, that his case log did not have the required physician signatures, that he spent four weeks of the rotation without a preceptor, and that he did not perform well enough to pass. Kehl and Wozniak's complaint was forwarded to the College of Medicine at Urbana-Champaign Student Progress and Promotions Committee (which we will call "the Student Progress Committee"), which held a meeting in October to discuss it. Charleston was not permitted to attend the Student Progress Committee meeting. He was, however, permitted to submit a letter regarding the preceptors' allegations. Upon review of the complaint and Charleston's letter, the Student Progress Committee recommended

that Charleston be assigned a mentor to ensure that he did not make similar mistakes in his future clinical rotations. At that point, Charleston states, the matter was resolved.

However, without notice to Charleston, Kehl and Wozniak's complaint and Charleston's letter were forwarded to another decision-making body, the College of Medicine at Urbana-Champaign Executive Committee (we'll call it "the Executive Committee"). Accompanying the complaint was a new letter from James Hall, the Associate Dean for Student Affairs for the College of Medicine. Hall alleged that back in 2008, Charleston had acted "unprofessionally" while serving as a teaching assistant in the School of Molecular and Cellular Biology. Charleston never had an opportunity to address Hall's allegation. He maintains that it was false. On October 27, the Executive Committee disregarded the Student Progress Committee's earlier recommendation and instead decided that Charleston should be dismissed from medical school entirely. Charleston appealed the Executive Committee's decision (it is not clear to whom), but the dismissal was upheld. He then appealed to the College Committee on Student Promotions, which also voted to dismiss him. Charleston appealed once more (again, not clear to whom), but to no avail. Charleston's dismissal was made final in January 2011.

Charleston filed a § 1983 action in federal district court against the Board of Trustees of the University of Illinois, University of Illinois at Chicago Chancellor Paula Allen-Meares, Associate Dean Hall, Dr. Kehl, Dr. Wozniak, and other unknown defendants. He claimed that his dismissal violated his Fourteenth Amendment due process and equal protection rights. He also brought state-law breach of contract and intentional infliction of emotional distress claims.

Charleston asked for money damages and an injunction re-
quiring the defendants "to cease all unlawful and unconsti-
tutional acts that they currently engage in."

The defendants moved to dismiss for failure to state a
claim. Charleston opposed the motion, and asked in the al-
ternative for leave to amend his complaint. The district court
granted the motion and dismissed all of Charleston's federal
claims with prejudice;[1] the court declined to exercise sup-
plemental jurisdiction over the state-law claims. It did not
address Charleston's request to amend his complaint.
Charleston appeals.

## II. Discussion

We review the district court's Rule 12(b)(6) dismissal de
novo. To state a claim for relief, a complaint must provide
more than "abstract recitations of the elements of a cause of
action or conclusory legal statements." *Brooks v. Ross*, 578
F.3d 574, 581 (7th Cir. 2009). Instead, a plausible claim must
include "factual content" sufficient to allow the court "to
draw the reasonable inference that the defendant is liable for
the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678
(2009). We can draw no such inferences from the facts in-
cluded in Charleston's complaint.

---

[1] The district court ruled that Charleston's federal claims for money
damages against the board and the university officials in their official
capacities were barred by state sovereign immunity. It also found, as an
alternate ground for its decision on his substantive due process claim,
that qualified immunity barred Charleston's suit on that claim against
the university officials in their individual capacities. (Charleston had not
asked for an injunction as a remedy for that particular claim.) As we ul-
timately dismiss each of Charleston's claims on the pleadings, we do not
reach the district court's immunity determinations.

## A. Due process claims

First, Charleston alleges a procedural due process claim based on the process by which the medical school dismissed him. There are two steps to any procedural due process analysis. First, the court must identify the protected property or liberty interest at stake. Second, it must determine what process is due under the circumstances. *Omosegbon v. Wells*, 335 F.3d 668, 674 (7th Cir. 2003). The district court found that Charleston's claim failed at the first step. We agree.

Charleston insists that he has a protected property interest in his continued education at the University of Illinois College of Medicine. However, our circuit has rejected the proposition that an individual has a stand-alone property interest in an education at a state university, including a graduate education. *See Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 601 (7th Cir. 2009); *Williams v. Wendler*, 530 F.3d 584, 589 (7th Cir. 2008).[2] It cannot be the case, we have reasoned, "that any student who is suspended from college has suffered a deprivation of constitutional property," in part

---

[2] Charleston argues that the Supreme Court's decision in *Goss v. Lopez*, 419 U.S. 565 (1975), recognized a student's protected interest in his or her public education. But he misreads *Goss*. The Supreme Court found that the Ohio high school students in that case "plainly had legitimate claims of entitlement to a public education" only because an Ohio state statute *promised* its young residents that education. *Id.* at 573 (citing the Ohio code, which required local authorities to provide a free education to all residents between five and twenty-one). "Having chosen to extend the right to an education to [high school students] generally," Ohio could not then deprive students of that right without due process. *Id.* at 574. Here, Charleston's complaint does not point to an Illinois statute that promises him an education at a state medical school. Thus, *Goss* is inapposite.

because this "would imply that a student who flunked out would have a right to a trial-type hearing on whether his tests and papers were graded correctly and a student who was not admitted would have a right to a hearing on why he was not admitted." *Williams*, 530 F.3d at 589. *But see Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988) (recognizing a general "interest in pursuing an education," including a university education); *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) (affirming that the Due Process Clause is "implicated" by university disciplinary decisions).

Instead of accepting a stand-alone interest, we ask whether the student has shown that he has a *legally protected entitlement* to his continued education at the university. *Bissessur*, 581 F.3d at 601–02; *Williams*, 530 F.3d at 589–90. Charleston could establish that he has this legitimate entitlement by pleading the existence of an express or implied contract with the medical school. *See Bissessur*, 581 F.3d at 601. For instance, Charleston could point to an agreement between himself and the school that he would be dismissed only for good cause. *Id.* But as we held in *Bissessur*, it is not enough for a student to merely state that such an implied contract existed. *Id.* at 603. Instead, the student's complaint must be specific about the source of this implied contract, the exact promises the university made to the student, and the promises the student made in return. *See id.* at 603–04.

Charleston maintains that he met this standard. Having reviewed his complaint closely, we disagree. All that his complaint alleges is that Charleston's dismissal was in violation of the university's "Student Disciplinary Policy" and "University Statutes." Charleston does not describe the specific promises that the university made to him through its

disciplinary policy, nor does he identify these "University Statutes" and their contents.

Rather, Charleston seems to be claiming that the school promised him *the procedures* set out in the university's disciplinary policy. *See* Complaint, ¶ 33 ("Defendant failed to comply with its own policies and due process protections set forth in its Student Disciplinary Policy by forwarding a complaint of academic dishonesty, i.e., plagiarism to the [Student Progress Committee] without intermediate review of a Student Discipline Subcommittee."); Complaint, ¶ 34 ("Defendant failed to comply with its own policies and due process protections set forth in its Student Disciplinary Policy by failing to allow Plaintiff a hearing, to be present and defend himself from the allegations against him, to confront the witnesses against him or to address any of the evidence presented against him."). We have rejected similar claims of an "interest in contractually-guaranteed university process" many times, *see, e.g.*, *Park v. Indiana University School of Dentistry*, 692 F.3d 828, 832 (7th Cir. 2012), but we will be clear once more: a plaintiff does not have a federal constitutional right to state-mandated process. *See Olim v. Wakinekona*, 461 U.S. 238, 250–51 (1983) ("Process is not an end in itself. … The State may choose to require procedures … but in making that choice the State does not create an independent substantive right."); *Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) ("As we tirelessly but unavailingly remind counsel in this court, a violation of state law (for purposes of this case the student judicial code may be treated as a state law) is not a denial of due process, even if the state law confers a procedural right."). Like other student-plaintiffs before him, all that Charleston alleges is that the medical school conferred on him certain procedural rights. It may have been

unfair for the university not to follow its own procedures in Charleston's case, but it was not unconstitutional.

That does not conclude the matter, though. In his reply brief, Charleston introduces a new account of where his implied contract with the university came from: the decision by the first committee that reviewed the complaints against him that Charleston remain in the medical school and only receive a mentor. His new theory is that when the Student Progress Committee issued this sanction, and Charleston "accepted" it, an agreement formed between the medical school and Charleston that he would not be dismissed. When the medical school nonetheless moved forward with the preceptors' complaints and the new allegation from Associate Dean Hall, Charleston says, the university "breached" their "original agreement." Needless to say, this theory of his implied contract does not come across on the face of his complaint; nor did he advance it below. But waiver aside, the complaint's allegations (and Charleston's briefing on appeal) repeatedly describe the Student Progress Committee's decision as a "recommendation" only. A recommendation can hardly be the basis for a binding contract between parties.

We therefore find that Charleston failed to identify a property interest at stake. As such, there is no need for us to proceed to the second step of the procedural due process analysis.

For similar reasons, we may dispose of Charleston's substantive due process claim. "Unless a governmental practice encroaches on a fundamental right, substantive due process requires only that the practice be rationally related to a legitimate government interest, or alternatively phrased, that the

practice be neither arbitrary nor irrational." *Lee v. City of Chi.*, 330 F.3d 456, 467 (7th Cir. 2003). But this rational-basis analysis presupposes that the individual has a property interest that the state can deprive him of. *See Bissessur*, 581 F.3d at 603 (dismissing the student's procedural *and* substantive due process claims when the student failed to plead the existence of an implied contract, as the student's "constitutional claims are derivative of the rights he alleges were promised to him").

Nor has Charleston pled a substantive due process claim based on a fundamental right. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (holding that the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests"). Charleston claims that he has a fundamental right to "all benefits and privileges of a public higher education."[3] He has no such thing. For one, the Supreme Court has disclaimed the existence of a fundamental right to an education generally, *see San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 35–37 (1973); and accordingly, our circuit has disclaimed the existence of a fundamental right to a graduate education specifically, *see Galdikas v. Fagan*, 342 F.3d 684, 688–89 (7th Cir. 2003), *abrogated on other grounds by Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004). Charleston offers no reason to reconsider either our interpretation of *San Antonio* or our own precedent. Nor can he claim a fundamental right to pursue the profession of his choosing. *See Park*, 692 F.3d at 832 (no right to follow a particular career). Thus, we

---

[3] Actually, the substantive due process portion of Charleston's complaint states only that he has a "clearly established" right to this education, but his brief on appeal indicates that he meant "fundamental."

affirm the dismissal of Charleston's substantive due process claim as well.

**B.  Equal protection "class of one" claim**

We come now to Charleston's third constitutional claim: the university's violation of his rights under the Equal Protection Clause. Charleston does not assert that the university dismissed him based on his membership in a protected group; instead, he advances an equal protection "class of one" claim. His complaint alleges that "the actions of Defendants were the result of personal animus against the Plaintiff, and said actions and denials were taken without any rational basis."

Our circuit has not settled on a standard for "class of one" claims—that is, claims that a state official denied an individual the equal protection of the laws simply by singling the individual out for special treatment. *See Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887 (7th Cir. 2012) (*en banc*). We need not return to that debate in this case, however, because Charleston cannot satisfy the even least demanding standard that could apply. *See Park*, 692 F.3d at 833 (applying the two standards derived from the lead and dissenting opinions in *Del Marcelle*). The *Del Marcelle* dissenters would require a showing that the "plaintiff was the victim of intentional discrimination … at the hands of a state actor," and that "the state actor lacked a rational basis for so singling out the plaintiff." *Del Marcelle*, 680 F.3d at 913 (Wood, J., dissenting); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)

(*per curiam*).[4] Charleston has not properly pled either of these elements.

One way to allege intentional discrimination is to show that the state treated similarly situated individuals more favorably. *Park*, 692 F.3d at 833; *see also Olech*, 528 U.S. at 564. That seemed to be Charleston's chosen method (we use the past tense because this too will change, see below). His complaint alleges that he was "retaliated against, harassed, disciplined against, intimidated, and dismissed from the medical school, all … differently than those similarly situated medical students subjected to the [Student Progress Committee] review process." But saying the magic words is not enough: Charleston must offer "further factual enhancement." *Iqbal*, 556 U.S. at 678. And his complaint tells us nothing about these "similarly situated medical students."

On appeal, Charleston offers a "Dr. Li" who he claims also failed to turn in the required quizzes for their OB/GYN

---

[4] We call the *Del Marcelle* dissenting opinion's standard the least demanding because it does not require the plaintiff to plead facts establishing the state actor's illegitimate motive or subjective ill will toward the plaintiff. *Compare Del Marcelle*, 680 F.3d at 889 (Posner, J., lead opinion) (requiring the plaintiff to show that "he was the victim of discrimination intentionally visited on him by state actors who knew or should have known that they had no justification, based on their public duties, for singling him out for unfavorable treatment" (emphasis omitted)); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000). If Charleston were required to plead an illegitimate motive, however, he has not done so. His complaint contains only a naked assertion that the university officials' actions "were the result of personal animus" toward him—he offers nothing, other than the mere fact of Hall's writing the letter and the university's reacting to it, to establish that the officials harbored some personal hostility toward him.

rotation on time, but who nonetheless escaped sanction. Of course, Charleston needed to mention this Dr. Li in his actual complaint. But it would not have made a difference if he had, because the accusations against Charleston did not solely concern his quizzes. Charleston was also accused of committing plagiarism in his patient paperwork, failing to obtain physician signatures for his case log, spending four weeks of the rotation without a preceptor, and not performing well enough in the rotation to pass. Moreover, he was accused of acting unprofessionally as a teaching assistant. *See Park*, 692 F.3d at 833 (finding "no reason to suppose" that other dental students were "comparable" to the plaintiff where the plaintiff was accused of significantly more academic and professional misconduct). As was the case in *Park*, the difference in Charleston's and Dr. Li's alleged culpability defeats a plausible inference that the school intentionally discriminated against the former. It also defeats an inference that the school's disparate treatment of the two students was irrational.

Once again, however, Charleston has proposed a new theory of the defendants' liability in his reply brief. Abandoning Dr. Li and the "similarly situated students" angle, he now maintains that he can plead his class-of-one claim by alleging that, because the Student Progress Committee had already addressed Dr. Kehl and Dr. Wozniak's complaint about Charleston's performance during the rotation, the Executive Committee's subsequent dismissal of Charleston lacked a rational basis. Charleston has waived this argument by failing to embrace it in his opposition to the motion to dismiss or in his initial brief. But even if we overlooked this, his new theory still does not state a viable equal protection claim. Assuming that the Student Progress Committee's de-

cision conclusively settled the university's response to the preceptors' allegations—and again, Charleston's consistent use of the term "recommendation" to describe the committee's decision suggests that we should assume no such thing—we still have Associate Dean Hall's allegation that Charleston acted unprofessionally as a teaching assistant. The fact that the disciplinary committees responded more harshly upon receiving this new complaint does not show that the administrators reacted irrationally. True, Charleston maintains that Hall's allegation was false (an assertion that we must credit at this stage), but he does not plead that the administrators *knew* that it was false and nonetheless dismissed him on that basis. Charleston's allegations amount to a claim that the university had poor reasons for dismissing him—but poor is not the same as irrational. Rather, "[i]t is entirely rational … to permit state actors to make individualized decisions when the very nature of their job is to take a wide variety of considerations into account." *Del Marcelle,* 680 F.3d at 913 (Wood, J., dissenting).

Thus, we affirm the dismissal of Charleston's equal protection claim.

## C.  Denial of leave to amend the complaint

Finally, Charleston argues that the district court should have granted him leave to amend his complaint. Charleston requested leave to amend in his opposition to the defendants' 12(b)(6) motion; the district court did not address his request in its order.

Federal Rule of Civil Procedure 15 provides that leave to amend should be "freely" given "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "district courts have broad

discretion to deny leave to amend" where "the amendment would be futile." *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008). We will only reverse a denial if the court abused this discretion. *Stanard v. Nygren*, 658 F.3d 792, 797 (7th Cir. 2011).

Preferably, the district court would have addressed its reasons for not granting leave to amend on the record. Regardless, in making his request, Charleston offered no suggestions at all about how he would cure the complaint's deficiencies. Under these circumstances, the district court did not abuse its discretion in denying Charleston a second chance. *See Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 943–44 (7th Cir. 2012) (finding no abuse of discretion where the plaintiff "did not offer any meaningful indication of how it would plead differently" in its motion to amend).

If there were any doubt on this score, Charleston has eliminated it on appeal. In explaining (in his reply brief) how he would amend his allegations if given the chance, Charleston has offered that he would plead the complaint "more succinctly" to show that he was dismissed on the basis of the letter from Associate Dean Hall, that Hall's allegation was both vague and false, that Charleston never had the opportunity to address the letter's allegations or confront Hall, that Charleston had already been sanctioned by the Student Progress Committee, that Charleston's acceptance of those sanctions had concluded the matter, and that Charleston's dismissal had no rational basis. Virtually all of that information was already in his complaint, however. And none of it sustains his constitutional claims. If Charleston only pro-

poses to rehash his original allegations, we find no abuse of discretion by the district court.

### III. Conclusion

We AFFIRM the judgment of the district court.