## In the
# United States Court of Appeals
### For the Seventh Circuit

No. 11-2820

HARVEY N. LEVIN,

*Plaintiff-Appellee,*

*v.*

LISA MADIGAN, in her individual capacity,
ANN SPILLANE, ALAN ROSEN,
ROGER FLAHAVEN, and DEBORAH HAGAN,

*Defendants-Appellants,*

and

LISA MADIGAN, in her official capacity as
Attorney General of Illinois, OFFICE OF THE
ILLINOIS ATTORNEY GENERAL, and
STATE OF ILLINOIS,

*Defendants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 4765—**Edmond E. Chang**, *Judge.*

ARGUED APRIL 3, 2012—DECIDED AUGUST 17, 2012

Before BAUER, POSNER, and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*. Harvey N. Levin worked as an Illinois Assistant Attorney General from September 5, 2000, until his termination on May 12, 2006. Levin was over the age of sixty at the time of his termination and believes he was fired because of his age and gender. Accordingly, Levin filed suit against the State of Illinois, the Office of the Illinois Attorney General, Illinois Attorney General Lisa Madigan, in her individual and official capacities, and four additional Attorney General employees in their individual capacities. He asserts claims for relief under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment via 42 U.S.C. § 1983. The individual-capacity defendants argued at the district court that they were entitled to qualified immunity with respect to Levin's § 1983 age discrimination claim. Specifically, they argued that Levin's § 1983 claim is precluded by the ADEA because the ADEA is the exclusive remedy for age discrimination claims. The district court disagreed and denied qualified immunity. The case is now before us on interlocutory appeal, and for the following reasons, we affirm the judgment of the district court.

## I. BACKGROUND

Levin was fifty-five years old when he was hired as an Assistant Attorney General in the Office of the Illinois Attorney General's Consumer Fraud Bureau on

September 5, 2000. On December 1, 2002, Levin was promoted to Senior Assistant Attorney General and retained this title until he was terminated on May 12, 2006. Levin was evaluated on an annual basis and his performance reviews indicate that he consistently met or exceeded his employer's expectations in twelve job categories. The Illinois Attorney General's Office asserts, however, that Levin's low productivity, excessive socializing, inferior litigation skills, and poor judgment led to his termination. Although not addressed in Levin's evaluations, these issues were discussed among Levin's supervisors and brought to Levin's attention.

Levin was one of twelve attorneys fired in May 2006. After he was terminated, Levin was replaced by a female attorney in her thirties. Two other male attorneys from the Consumer Fraud Bureau, both over the age of forty, were also terminated and replaced by younger attorneys, one male and one female. The Illinois Attorney General's Office disputes that these new hires "replaced" the terminated attorneys because the younger attorneys were not assigned the three former attorneys' cases.

Levin filed his complaint in the Northern District of Illinois on August 23, 2007, asserting claims of age and sex discrimination under the ADEA, Title VII, and the Equal Protection Clause via 42 U.S.C. § 1983. The defendants in this suit are divided into two groups for litigation purposes: (1) Lisa Madigan, in her official capacity as the Illinois Attorney General, the Office of the Illinois Attorney General, and the State of Illinois (the "Entity Defendants"), and (2) Lisa Madigan as an indi-

vidual, Ann Spillane, Alan Rosen, Roger Flahavan, and Deborah Hagan (the "Individual Defendants"). Only the Individual Defendants have appealed to this court.

On November 26, 2007, the Entity Defendants and the Individual Defendants filed separate motions to dismiss Levin's complaint in its entirety. On December 12, 2007, the district court stayed discovery, requiring Levin to respond to the Entity Defendants's motion as to whether he was an "employee" for purposes of the ADEA and Title VII. On September 12, 2008, the district court held that Levin was an "employee" and lifted the stay on discovery. The Entity Defendants filed a second motion to dismiss shortly thereafter. Following discovery, the Entity Defendants and the Individual Defendants filed separate motions for summary judgment on November 13, 2009.

The district court ruled on the five pending motions in two separate opinions, both of which are pertinent to the issues before this court. In the first opinion, decided March 10, 2010, the Honorable David H. Coar addressed the three pending motions to dismiss. *See Levin v. Madigan*, 697 F. Supp. 2d 958 (N.D. Ill. 2010) [hereinafter *Levin I*]. Relevant to this appeal, Judge Coar granted the Individual Defendants' motion to dismiss Levin's § 1983 equal protection claim for age discrimination. *Id.* at 972. In that motion, the Individual Defendants asserted that the § 1983 claim was either precluded by the ADEA or they were entitled to qualified immunity. After acknowledging that the Seventh Circuit has yet to address ADEA exclusivity, Judge Coar held that the

ADEA does not foreclose Levin's § 1983 equal protection claim. *Id.* at 971. But Judge Coar granted qualified immunity for the Individual Defendants because the availability of such a claim was not clearly established at the time Levin was terminated. *Id.* at 972 ("Indeed, this Court's lengthy analysis of the availability of such claims demonstrates that the law is not clearly established.").

On January 7, 2011, Levin's case was reassigned to the Honorable Edmond E. Chang. Judge Chang issued an opinion on July 12, 2011, granting in part and denying in part the two pending motions for summary judgment. *Levin v. Madigan*, No. 07 C 4765, 2011 WL 2708341, at *23 (N.D. Ill. July 12, 2011) [hereinafter *Levin II*]. Judge Chang did not disturb Judge Coar's ruling that the ADEA is not the exclusive remedy for age discrimination claims. *Id.* at *8. He did, however, reverse two of Judge Coar's prior rulings, in light of additional briefing. First, Judge Chang determined that Levin is not an "employee" for purposes of Title VII and the ADEA, thus foreclosing any claim Levin could bring under those statutes. *See id.* at *11. Second, Judge Chang held that the Individual Defendants were not entitled to qualified immunity on Levin's § 1983 claim for age discrimination. *Id.* at *12-13. Rejecting Judge Coar's reasoning, Judge Chang noted that "[w]hen determining whether qualified immunity applies to protect a defendant, the question is whether a reasonable official would have known that the official was violating a clearly established constitutional right, which is a substantive question, not a question concerning whether a particular procedural vehicle (*i.e.*,

cause of action) is available." *Id.* at \*12. Because it is clearly established that the Fourteenth Amendment forbids arbitrary age discrimination, *see Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83-84 (2000), Judge Chang held that qualified immunity did not apply and Levin had established a genuine issue of material fact such that his § 1983 age discrimination claim could proceed to trial. *Levin II*, 2011 WL 2708341, at \*20. The Individual Defendants filed this timely appeal, asking this court to find that they are entitled to qualified immunity because the ADEA is the exclusive remedy for Levin's age discrimination claims.

## II. ANALYSIS

### A. Appellate Jurisdiction

Levin does not dispute that we have jurisdiction over an order denying qualified immunity under the collateral order doctrine. *See Surita v. Hyde*, 665 F.3d 860, 868 (7th Cir. 2011). But Levin believes this court lacks jurisdiction over the issue of whether the ADEA precludes a § 1983 equal protection claim. Levin asserts that this issue, resolved in Judge Coar's opinion, is not inextricably intertwined with Judge Chang's denial of qualified immunity. *See Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 976-77 (7th Cir. 2010) (doctrine of pendent jurisdiction allows appellate court to review an interlocutory order that is inextricably intertwined with an appealable order).

We disagree with Levin's analysis. Instead, we believe this case is analogous to *Wilkie v. Robbins*, 551 U.S.

537 (2007). In *Wilkie*, on an interlocutory appeal of the denial of qualified immunity, the Supreme Court considered whether a new, freestanding damages remedy should exist under *Bivens*. *Id.* at 548-50 (*citing Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971)). The Supreme Court held that it had jurisdiction to consider whether such a remedy existed because the recognition of an entire cause of action is "directly implicated by the defense of qualified immunity." *Id.* at 549 n.4 (*quoting Hartman v. Moore*, 547 U.S. 250, 257 n.5 (2006)). Similar to *Wilkie*, the very existence of a freestanding damages remedy under § 1983 is directly implicated by a qualified immunity defense such that we have jurisdiction over this appeal. Thus, we first consider whether the ADEA precludes a § 1983 equal protection claim before we turn to the issue of qualified immunity.

### B. General Preclusion of § 1983 Claims

Section 1 of the Civil Rights Act of 1871, codified as 42 U.S.C. § 1983, "authorizes suits to enforce individual rights under federal statutes as well as the Constitution" against state and local government officials. *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 119 (2005). Section 1983 does not create substantive rights, but operates as "a means for vindicating federal rights conferred elsewhere." *Padula v. Leimbach*, 656 F.3d 595, 600 (7th Cir. 2011) (*quoting Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997)).

In evaluating the limits of relief available under § 1983 for statutory claims, the Supreme Court has held that

"[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981). In *Sea Clammers*, the Supreme Court held that a suit for damages under the Federal Water Pollution Control Act ("FWPCA") or Marine Protection, Research, and Sanctuaries Act of 1972 ("MPRSA") could not be brought pursuant to § 1983 because both Acts "provide quite comprehensive enforcement mechanisms." *Id.* These mechanisms include citizen-suit provisions, which allow private citizens to sue for prospective relief, and notice provisions requiring such plaintiffs to notify the EPA, the State, and the alleged violator before filing suit. *Id.* at 6.

Over two decades after *Sea Clammers*, the Supreme Court again rejected a plaintiff's attempt to seek damages under § 1983 for violation of a statute which provided its own, more restrictive judicial remedy. *See Rancho Palos Verdes*, 544 U.S. at 121-23. In *Ranchos Palos Verdes*, the plaintiff filed suit for injunctive relief under the Telecommunications Act of 1996 ("TCA") and sought damages and attorney's fees under § 1983 after a city planning committee denied his request for a conditional-use permit for an antenna tower on his property. *Id.* at 117-18. The TCA "imposes specific limitations on the traditional authority of state and local governments to regulate the location, construction, and modification of [wireless communications] facilities." *Id.* at 115. When a permit is requested and denied, the

TCA requires local governments to provide a written decision, supported by substantial evidence, within a reasonable period of time. *Id.* at 116. An individual may seek judicial review within thirty days of this decision, *id.*, and the court is required to hear and decide the case on an expedited basis, *id.* at 122. Further, a plaintiff may not be entitled to compensatory damages and cannot recover attorney's fees and costs. *Id.* at 122-23.

In discerning congressional intent, the Court held that "[t]he provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983." *Id.* at 121. Conversely, the Court noted that "in *all* of the cases in which we have held that § 1983 *is* available for violation of a federal statute, we have emphasized that the statute at issue . . . *did not* provide a private judicial remedy . . . for the rights violated." *Id.* Because the TCA's provisions limit the relief available to private individuals and provide for expedited judicial review, the Court held that the TCA precludes relief under § 1983. *Id.* at 127.

While the plaintiffs in *Sea Clammers* and *Rancho Palos Verdes* sought to assert federal *statutory* rights under § 1983, two other Supreme Court cases have examined whether a plaintiff is precluded from asserting *constitutional* rights under § 1983 when a remedial statutory scheme also exists. In *Smith v. Robinson*, the Supreme Court held that Congress intended the Education of the Handicapped Act ("EHA"), 91 Pub. L. No. 230, 84 Stat. 175, as amended, 20 U.S.C. § 1400 *et. seq.* (1982), "to be the

exclusive avenue through which a plaintiff may assert an equal protection claim to a publicly financed special education." 468 U.S. 992, 1009 (1984), *superseded by statute*, Handicapped Children's Protection Act of 1986, Pub. L. No. 99-372, 100 Stat. 796. The EHA was designed to "aid the States in complying with their constitutional obligations to provide public education for handicapped children." *Id.* The Act established "an enforceable substantive right to a free appropriate public education" and "an elaborate procedural mechanism to protect the rights of handicapped children." *Id.* at 1010-11. Under the EHA, plaintiffs were entitled to a fair and adequate state hearing, detailed procedural safeguards, and judicial review. *Id.* at 1011. Relying on the comprehensive statutory scheme and legislative history, the Supreme Court held that Congress did not intend to allow a handicapped child to bypass the EHA and go directly to court with a § 1983 equal protection claim as "such a result [would] render superfluous most of the detailed procedural protections in the statute." *Id.*[1]

---

[1] Notably, Congress disagreed with the Supreme Court's interpretation of its intent. In the Handicapped Children's Protection Act of 1986, Pub. L. No. 99-372, 100 Stat. 796 (1986), Congress added the following provision to the EHA:

> Nothing in this title shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act . . . of 1973, or other Federal statutes protecting the

(continued...)

In *Preiser v. Rodriguez*, the Supreme Court considered whether state prisoners deprived of good-time credits could pursue their claims for equitable relief under § 1983 or if such a remedy was unavailable because of the habeas corpus statutes, 28 U.S.C. §§ 2241, 2254. 411 U.S. 475, 477 (1973). The Supreme Court discussed the history of habeas corpus and recognized that "over the years, the writ of habeas corpus evolved as a remedy available to effect discharge from any confinement contrary to the Constitution or fundamental law." *Id.* at 485. Procedurally, the writ requires a prisoner to exhaust his adequate state remedies prior to seeking federal judicial relief. *Id.* at 489. The Court held that Congress intended habeas corpus to be the sole remedy, as "[i]t would wholly frustrate explicit congressional intent to hold that the respondents in the present case could evade this requirement by the simple expedi-

---

[1] (...continued)

> rights of handicapped children and youth, except that before the filing of a civil action under such laws seeking relief that is also available under this part, the procedures under subsections (b)(2) and (c) shall be exhausted to the same extent as would be required had the action been brought under this part.

Thus, although Congress requires a handicapped plaintiff asserting a claim for free appropriate education to first exhaust his or her administrative remedies under the EHA, § 1983 equal protection claims are no longer precluded. *See Bd. of Educ. of E. Windsor Reg'l Sch. Dist. v. Diamond*, 808 F.2d 987, 995 (3d Cir. 1986).

ent of putting a different label on their pleadings."
*Id.* at 489-90.

Although we have highlighted the four opinions in
*Sea Clammers*, *Rancho Palos Verdes*, *Smith*, and *Preiser*, each
of which found a § 1983 claim precluded, the Supreme
Court does not "lightly conclude that Congress in-
tended to preclude reliance on § 1983 as a remedy" for
the deprivation of a federal right. *Smith*, 468 U.S. at 1012
(noting that § 1983 has always been "an independent
safeguard against deprivations of federal constitutional
and statutory rights"). In fact, the Court has rejected § 1983
preclusion arguments in several other cases. *See, e.g.*,
*Blessing v. Freestone*, 520 U.S. 329, 348 (1997) (if Title IV-D
of the Social Security Act gives rise to individual rights,
its enforcement scheme contains no private remedy
and is not comprehensive enough to preclude § 1983 lia-
bility); *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 520-23 (1990)
(unlike the statutory schemes in *Sea Clammers* and
*Smith*, "[t]he Medicaid Act contains no comparable provi-
sion for private judicial or administrative enforcement"
and its administrative scheme is not "sufficiently com-
prehensive to demonstrate a congressional intent to
withdraw the private remedy of § 1983"); *Wright v. City
of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 427-
29 (1987) (Department of Housing and Urban Develop-
ment's generalized powers under its regulations and
an amendment to the Housing Act were not sufficiently
comprehensive to foreclose a § 1983 remedy).

Most recently, the Supreme Court considered whether
Title IX of the Education Amendments of 1972, 20 U.S.C.

§ 1681(a), precludes a § 1983 equal protection claim. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009). The Court first acknowledged the importance of discerning congressional intent and summarized its prior rulings, stating:

> In cases in which the § 1983 claim alleges a constitutional violation, lack of congressional intent may be inferred from a comparison of the rights and protections of the statute and those existing under the Constitution. Where the contours of such rights and protections diverge in significant ways, it is not likely that Congress intended to displace § 1983 suits enforcing constitutional rights. Our conclusions regarding congressional intent can be confirmed by a statute's context.

*Id.* at 252-53. The Court also recognized that, in its prior opinions finding preclusion, the statutes at issue required plaintiffs to exhaust their administrative remedies or comply with other procedural requirements before filing suit. *Id.* at 254. "Offering plaintiffs a direct route to court via § 1983 would have circumvented these procedures and given plaintiffs access to tangible benefits—such as damages, attorney's fees, and costs—that were unavailable under the statutes." *Id.*

Turning to the statute before it, the Supreme Court examined Title IX's remedial scheme and determined that Title IX does not preclude a § 1983 equal protection claim. Title IX prohibits discrimination on the basis of gender in educational programs that receive federal financial assistance. *Id.* at 255 (*quoting* 20 U.S.C. § 1681(a)).

Two enforcement mechanisms exist: (1) "an administra-
tive procedure resulting in the withdrawal of federal
funding from institutions that are not in compliance"
and (2) an implied private right of action, through which
a plaintiff may seek injunctive relief and recover dam-
ages. *Id.* A plaintiff suing under Title IX is not required to
exhaust any administrative remedies or provide notice
before filing suit; instead, "plaintiffs can file directly in
court and can obtain the full range of remedies." *Id.*
(internal citation omitted). Further, Congress failed to
include an express private right remedy, and the Court
"has never held that an implied right of action had the
effect of precluding suit under § 1983, likely because of the
difficulty of discerning congressional intent in such a
situation." *Id.* at 256.

The Court also emphasized the differences between
the protections guaranteed by Title IX and the Equal
Protection Clause. First, Title IX permits a plaintiff to
sue institutions and programs receiving federal
funding, but does not authorize suit against school offi-
cials, teachers, or other individuals. *Id.* at 257. In contrast,
§ 1983 equal protection claims reach state actors,
including individuals, municipalities, and other state
entities. *Id.* Second, some policies that are exempted under
Title IX could still be subject to claims under the Equal
Protection Clause. *Id.* (*citing United States v. Virginia*, 518
U.S. 515, 534 (1996) (male-only admissions policy at
Virginia Military Institute would not violate Title IX but
did violate the Equal Protection Clause); *Miss. Univ. for
Women v. Hogan*, 458 U.S. 718, 731 (1982) (policy of admit-
ting only females at traditionally single-sex college

violated the Equal Protection Clause, but such policies are exempted under Title IX)). Finally, the Court noted that "the standards for establishing liability may not be wholly congruent." *Id.* For example, a Title IX plaintiff may only have to show that a school administrator acted with deliberate indifference while a § 1983 plaintiff must demonstrate the existence of a municipal custom, policy, or practice. *Id.* at 257-58. Because of these differences and the absence of a comprehensive remedial scheme, the plaintiffs' § 1983 equal protection claim was not precluded.

We conclude from these cases that, in determining whether a § 1983 equal protection claim is precluded by a statutory scheme, the most important consideration is congressional intent. Congressional intent may be construed from the language of the statute and legislative history, *Smith*, 468 U.S. at 1009, the statute's context, *Rancho Palos Verdes*, 544 U.S. at 127 (Breyer, J., concurring), the nature and extent of the remedial scheme, *Sea Clammers*, 453 U.S. at 20, and a comparison of the rights and protections afforded by the statutory scheme versus a § 1983 claim, *Fitzgerald*, 555 U.S. at 252-53. A statutory scheme may preclude a § 1983 constitutional claim, *see Smith*, 468 U.S. at 1013, especially if a § 1983 claim circumvents the statute's carefully tailored scheme and provides access to benefits unavailable under that scheme, *Fitzgerald*, 555 U.S. at 254. Keeping these concepts in mind, we now turn to the issue before us: whether the ADEA precludes a § 1983 equal protection claim.

*C. ADEA Preclusion of § 1983 Claims*

Congress enacted the ADEA "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). The ADEA makes it unlawful for an employer to "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." *Id.* § 623(a)(1). In general, the ADEA provides coverage for private, state, and federal employees who are forty years of age and older, *id.* §§ 630(f), 631(a), 633a(a), albeit with a few notable exceptions, *see id.* §§ 623(j), 630(f). The Act "incorporates some features of both Title VII and the Fair Labor Standards Act of 1938 [FLSA], which has led [the Supreme Court] to describe it as 'something of a hybrid.' " *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 357 (1995) (*quoting Lorillard v. Pons*, 434 U.S. 575, 578 (1978)). Specifically, the substantive provisions of the ADEA are modeled after Title VII, while its remedial provisions incorporate provisions of the FLSA. *Id.*; 29 U.S.C. § 626(b).

The ADEA expressly grants individual employees a private right of action. *McKennon*, 513 U.S. at 358 (*citing* 29 U.S.C. § 626(c) ("Any person aggrieved may bring a civil action in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter.")). An ADEA plaintiff must first file a charge with the Equal Employment Oppor-

tunity Commission (EEOC), generally within 180 days of the unlawful age discrimination. 29 U.S.C. § 626(d)(1). The EEOC then notifies all parties involved and, if the EEOC believes there has been a violation, the agency "promptly seek[s] to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion." *Id.* § 626(d)(2). If the EEOC charge is dismissed or terminated, the EEOC is required to notify the plaintiff. *Id.* § 626(e).

Sixty days after filing an EEOC charge, a plaintiff is entitled to file a civil lawsuit and, if he seeks damages, receive a trial by jury. *Id.* § 626(c)(1)-(2). This right terminates, however, if the EEOC files its own lawsuit to enforce the plaintiff's claim. *Id.* § 626(c)(1). "When confronted with a violation of the ADEA, a district court is authorized to afford relief by means of reinstatement, backpay, injunctive relief, declaratory judgment, and attorney's fees." *McKennon*, 513 U.S. at 357. If a violation was willful, a plaintiff may recover liquidated damages. *Id.* "The Act also gives federal courts the discretion to 'grant such legal or equitable relief as may be appropriate to effectuate the purposes of [the Act].'" *Id.* at 357-58 (*quoting* 29 U.S.C. § 626(b)).

Whether the ADEA precludes a § 1983 equal protection claim is a matter of first impression in the Seventh Circuit. All other circuit courts to consider the issue have held that the ADEA is the exclusive remedy for age discrimination claims, largely relying on the Fourth Circuit's reasoning in *Zombro v. Baltimore City Police Department*, 868 F.2d 1364 (4th Cir. 1989). *See, e.g., Ahlmeyer*

*v. Nev. Sys. of Higher Educ.*, 555 F.3d 1051, 1057 (9th Cir. 2009); *Tapia-Tapia v. Potter*, 322 F.3d 742, 745 (1st Cir. 2003); *Migneault v. Peck*, 158 F.3d 1131, 1140 (10th Cir. 1998), *vacated on other grounds sub nom.*, *Bd. of Regents of Univ. of N.M. v. Migneault*, 528 U.S. 1110 (2000); *Lafleur v. Tex. Dep't of Health*, 126 F.3d 758, 760 (5th Cir. 1997); *Chennareddy v. Bowsher*, 935 F.2d 315, 318 (D.C. Cir. 1991). District courts located in other circuits, however, are split on the issue. *Compare Shapiro v. N.Y. City Dep't of Educ.*, 561 F. Supp. 2d 413, 420 (S.D.N.Y. 2008) (weight of authority in the Second Circuit holds that the ADEA does not preclude a § 1983 claim), *and Mustafa v. State of Neb. Dep't of Corr. Servs.*, 196 F. Supp. 2d 945, 956 (D. Neb. 2002) (the ADEA does not impliedly repeal § 1983 constitutional claims), *with Kelley v. White*, No. 5:10CV00288, 2011 WL 4344180, at *3 (E.D. Ark. Sept. 15, 2011) (the ADEA is the exclusive remedy for age discrimination claims), *and Phillis v. Harrisburg Sch. Dist.*, No. 1:07-cv-1728, 2010 WL 1390663, at *10 (M.D. Pa. Mar. 31, 2010) (same). In the present case, two district court judges from the Northern District of Illinois held that the ADEA does not preclude a § 1983 equal protection claim. *Accord McCann v. City of Chicago*, Nos. 89 C 2879 & 90 C 0464, 1991 WL 2538, at *2 (N.D. Ill. Jan. 8, 1991).

In *Zombro*, the Fourth Circuit held that allowing a plaintiff to seek recovery for age discrimination through a § 1983 equal protection claim would undermine the comprehensive remedial scheme set forth in the ADEA. 868 F.2d at 1366-67. Citing the ADEA's provisions requiring notice to the EEOC, informal conciliation, and termination of a plaintiff's action upon the filing of a

complaint by the EEOC, the court believed that if a plaintiff could pursue a § 1983 action instead, "[t]he plaintiff would have direct and immediate access to the federal courts, the comprehensive administrative process would be bypassed, and the goal of compliance through mediation would be discarded." *Id.* at 1366. Where Congress has enacted a comprehensive statutory scheme, such as the ADEA, the Fourth Circuit holds that preclusion of § 1983 suits is appropriate "unless the legislative history of the comprehensive statutory scheme in question manifests a congressional intent to allow an individual to pursue independently rights under both the comprehensive statutory scheme and other applicable state and federal statutes, such as 42 U.S.C. § 1983." *Id.* at 1369. The Fourth Circuit found no such intent in the language and history of the ADEA. *Id.* That court also relied upon the ADEA's adoption of Section 216 of the FLSA, which has been held to be "the sole remedy available to the employee for enforcement of whatever rights he may have under the FLSA." *Id.* (*citing Lerwill v. Inflight Motion Pictures, Inc.*, 343 F. Supp. 1027 (N.D. Cal. 1972)). To the court, this shared provision, along with the ADEA's precisely drawn statutory scheme, evidenced congressional intent that the ADEA be the exclusive remedy for age discrimination suits. *Id.*

Several circuit courts addressing ADEA preclusion have simply relied on *Zombro*'s holding. *See, e.g., Tapia-Tapia*, 322 F.3d at 745 ("The ADEA provides the exclusive federal remedy for age discrimination in employment." (*citing Zombro*, 868 F.2d at 1369)); *Chennareddy*, 935

F.2d at 318 (same). But not all district court judges are convinced. The leading district court case rejecting ADEA preclusion of § 1983 equal protection claims is *Mummelthie v. City of Mason City, Iowa*, 873 F. Supp. 1293 (N.D. Iowa 1995). In that case, Judge Bennett sharply criticized the Fourth Circuit's analysis in *Zombro*, noting that the court failed to consider the statutory language and legislative history of the ADEA, as well as its similarities to Title VII, a statutory scheme which does not preclude § 1983 claims. *Id.* at 1319, 1322 (*citing*, *e.g.*, *Trigg v. Fort Wayne Cmty. Sch.*, 766 F.2d 299, 302 (7th Cir. 1985) ("A plaintiff may sue her state government employer for violations of the Fourteenth Amendment through § 1983 and escape Title VII's comprehensive remedial scheme, even if the same facts would suggest a violation of Title VII.")).

Given the conflicting case law, further review of this issue is required. Although the ADEA enacts a comprehensive statutory scheme for enforcement of its own statutory rights, akin to *Sea Clammers* and *Rancho Palos Verdes*, we find that it does not preclude a § 1983 claim for constitutional rights.[2] While admittedly a close call, especially in light of the conflicting decisions from our sister circuits, we base our holding on the ADEA's lack

---

[2]  Because this decision creates a conflict among the circuits, this opinion has been circulated before release to all active judges under Circuit Rule 40(e). No judge favored a hearing en banc; Circuit Judge Flaum did not participate in the consideration or decision of this case.

of legislative history or statutory language precluding constitutional claims, and the divergent rights and protections afforded by the ADEA as compared to a § 1983 equal protection claim. *Cf. Fitzgerald*, 555 U.S. at 252-53.

### 1. Statutory Text and Legislative History

Nothing in the text of the ADEA expressly precludes a § 1983 claim or addresses constitutional rights. *See Zombro*, 868 F.2d at 1374 (Murnaghan, J., concurring in part and dissenting in part). Nor does the legislative history provide clear guidance on this issue.[3] Although

---

[3] *Mummelthie* and other district courts rely, in part, on the legislative history of the ADEA in finding that Congress did not intend to preclude § 1983 equal protection claims. In 1972, Senator Lloyd Bentsen sponsored an ADEA amendment to subject federal, state, and local government employers to the ADEA. *See* 118 Cong. Rec. 15,895 (1972). At the time, a similar Title VII amendment had been proposed, and an unidentified committee report stated that federal, state, and local employees should be entitled "to the same benefits and protections in equal employment as the employees in the private sector." *Id.* After citing this report, Senator Bentsen argued that "the principles underlying these provisions in the EEOC bill are directly applicable to the [ADEA]." *Id.* In a House report addressing the Title VII amendment, Congress clearly acknowledged the continued viability of a § 1983 claim. H.R. Rep. No. 92-238, at 18 (1971), *reprinted in* 1972 U.S.C.C.A.N. 2137, 2154 ("In establishing the applicability of Title VII to State and local employees, the Committee wishes to emphasize that the

(continued...)

the *Zombro* court interpreted this lack of explicit language or legislative history as congressional intent not to allow individuals to pursue constitutional rights outside of the ADEA's scheme, *see id.* at 1369, we reach the opposite conclusion. Congress's silence on the issue tells us nothing about preclusion—we do not know whether Congress even considered alternative constitutional remedies in enacting the ADEA.

We agree with the *Zombro* majority that the ADEA sets forth a rather comprehensive remedial scheme. The ADEA provides a private right of action, requires notice and exhaustion of remedies, and limits the damages available under the Act. *See* 29 U.S.C. § 626(b), (d)(1)-(2). Like *Sea Clammers* and *Rancho Palos Verdes*, this scheme speaks volumes as to how Congress intended allegations of *statutory* age discrimination to proceed.

---

[3] (...continued)
individual's right to file a civil action in his own behalf, pursuant to [42 U.S.C. §§ 1981, 1983], is in no way affected."). *Mummelthie* therefore concludes that Senator Bentsen's comment implies that the same non-preclusion principle applies to the ADEA. 873 F. Supp. at 1325-26.

Although at first blush, Senator Bentsen's remark appears to support *Mummelthie's* reasoning, his comments are somewhat ambiguous and it's unclear whether he was referencing H.R. Rep. No. 92-238 and the committee's statement that § 1983 claims were "in no way affected." Given the ambiguous nature of Senator Bentsen's remark, we have a difficult time relying on it as proof of congressional intent.

But, as to constitutional claims, we do not believe Congress's intent is as apparent as other circuit courts have found. As noted in *Mummelthie*, "the ADEA does not purport to provide a remedy for violation of federal constitutional rights" and no express language indicates that Congress intended to foreclose relief under § 1983 for constitutional violations. 873 F. Supp. at 1325. Beyond that, we have a hard time concluding that Congress's mere creation of a statutory scheme for age discrimination claims was intended to foreclose pre-existing constitutional claims. Congress frequently enacts new legal remedies that are not intended to repeal their predecessors. *See, e.g., Salinas v. United States*, 522 U.S. 52, 64 (1997) (comparing the general criminal conspiracy statute to the later-enacted Racketeer Influenced and Corrupt Organizations Act (RICO)). Accordingly, the Supreme Court has emphasized on several occasions that "repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest." *Hui v. Castaneda*, 130 S. Ct. 1845, 1853 (2010) (*quoting Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 175 (2009)).

What, then, do we make of the Supreme Court's holdings in *Smith* and *Preiser*, which held that constitutional claims were barred by the existence of comprehensive statutory schemes? In both of those cases, the statutes at issue were specifically designed to address constitutional issues. For instance, the habeas corpus statutes in *Preiser* provide a remedy for prisoners "in custody in violation of *the Constitution* or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3) (emphasis

added); *accord* 28 U.S.C. § 2254(a). Similarly, the *Smith* court acknowledged that "[t]he EHA is a comprehensive scheme set up by Congress to aid the States in complying with *their constitutional obligations* to provide public education for handicapped children." 468 U.S. at 1009 (emphasis added). The statute itself provides that federal intervention is necessary to "ensure equal protection of the law." 20 U.S.C. § 1400(c)(6). This goal is also referenced in the legislative history, as recognized in *Smith*. 468 U.S. at 1010 (*quoting* S. Rep. No. 94-168, at 13 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1425, 1437). These references demonstrate that Congress considered alternative constitutional remedies in enacting the EHA.

The ADEA is readily distinguishable. "In contrast to the statutes at issue in *Preiser* and in *Smith*, the ADEA does not purport to provide a remedy for violation of constitutional rights. Instead, it provides a mechanism to enforce only the substantive rights created by the ADEA itself." *Zombro*, 868 F.2d at 1373 (Murnaghan, J., concurring in part and dissenting in part). For the preclusion of *constitutional* claims, we believe more is required than a comprehensive statutory scheme. This notion is supported by the Supreme Court's references in *Smith* to the legislative history of the EHA. 468 U.S. at 1009 ("Both the provisions of the statute and its legislative history indicate that Congress intended handicapped children with constitutional claims to a free appropriate public education to pursue those claims through the carefully tailored administrative and judicial mechanism set out in the statute."). Thus, in *Smith*, it was more than just the comprehensive remedial scheme that

convinced the Court that the EHA is an exclusive remedy. In this way, *Smith* differs from *Sea Clammers* and *Rancho Palos Verdes*, cases tasked only with determining whether § 1983 statutory claims were precluded by that statute's own comprehensive scheme. In sum, even though the ADEA is a comprehensive remedial scheme, without some additional indication of congressional intent, we cannot say that the ADEA's scheme alone is enough to preclude § 1983 constitutional claims.

The Ninth Circuit's recent *Ahlmeyer* decision raises one additional point on this issue that necessitates discussion, as the court relied upon our prior precedent. As background, because age is not a suspect classification, an equal protection claim of age discrimination in employment is subject only to rational basis review, in which the age classification must be rationally related to a legitimate state interest. *See Kimel*, 528 U.S. at 83-84. In contrast, the ADEA "prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection, rational basis standard." *Id.* at 86. Thus, the *Ahlmeyer* decision notes in its opinion that "[b]ecause the ADEA provides broader protection than the Constitution, a plaintiff has 'nothing substantive to gain' by also asserting a § 1983 claim." 555 F.3d at 1058 (*citing Williams v. Wendler*, 530 F.3d 584, 586 (7th Cir. 2008)).

In *Williams*, we briefly discussed the plaintiffs' failure to differentiate their Title VI and equal protection claims. 530 F.3d at 586. Citing *Sea Clammers*, we noted that "[w]hen Congress enacts a comprehensive scheme

for enforcing a statutory right that is identical to a right enforceable under 42 U.S.C. § 1983, . . . the section 1983 lawsuit must be litigated in accordance with the scheme." *Id.* We then recognized that, according to the Supreme Court, Title VI proscribes only those racial classifications that violate the Equal Protection Clause. *Id.* (*quoting Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978)). Thus, there was nothing to gain by asserting an equal protection claim, and failure to comply with Title VI's procedural requirements would have left the plaintiffs without a remedy. *Id.* But again, like *Smith*, Title VI's legislative history provides insight into Congress's intent. *See Bakke*, 438 U.S. at 286-87 ("In view of the *clear legislative intent*, Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause . . . ." (emphasis added)). In light of this clear congressional intent, *Williams* (like *Smith*) is also distinguishable from the ADEA. And while we freely acknowledge that the ADEA's heightened scrutiny provides a stronger mechanism for plaintiffs to challenge age discrimination in employment, absent any additional indication from Congress, we simply cannot infer that Congress intended to do away with a § 1983 constitutional alternative. *See Smith*, 468 U.S. at 1012 ("Since 1871, when it was passed by Congress, § 1983 has stood as an independent safeguard against deprivations of federal constitutional and statutory rights.").

Finally, the circuit courts rely upon Congress's incorporation of the FLSA's remedial scheme in finding that Congress intended to preclude a § 1983 constitutional

remedy. *See Zombro*, 868 F.2d at 1369. This is a perplexing argument because the cases which have found the FLSA to be an exclusive remedy do not (and, in fact, cannot) address constitutional claims. *See Kendall v. City of Chesapeake, Va.*, 174 F.3d 437, 439 (4th Cir. 1999) ("We hold that the elaborate remedial scheme provided in the FLSA demonstrates a congressional intent to prohibit § 1983 actions *to enforce such FLSA rights.*" (emphasis added)); *Lerwill*, 343 F. Supp. at 1029 (same). Unlike Title VII and the ADEA, the rights created by the FLSA are not based on rights also guaranteed by the Constitution. Thus, cases addressing FLSA exclusivity speak little to the issue presently before this court. We have no quarrel with the notion that the FLSA is the sole remedy for the enforcement of FLSA rights and, similarly, the ADEA is the sole remedy for the enforcement of ADEA rights.[4] Even the district courts that believe the ADEA does not preclude § 1983 constitutional claims agree on this point. *See, e.g., Mustafa*, 196 F. Supp. 2d at 956 n.13 ("[S]ection 1983 cannot be used as an alternate mechanism to assert violation of the ADEA's provisions against states."); *Mummelthie*, 873 F. Supp. at 1317 ("The court has no dispute with the conclusions of those federal courts holding that . . . state, local, and private employees cannot use § 1983 to address violations based directly on the ADEA itself and

---

[4] We have also recognized that a plaintiff may not seek to enforce rights conveyed by Title VII through a § 1983 claim. *See Trigg*, 766 F.2d at 301 (*citing Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979)).

not on independent, federal constitutional rights."). Because the FLSA lacks a constitutional counterpart, it provides little additional guidance beyond the statutory text.[5]

## 2. Comparison of Rights and Protections

Given the absence of any clear or manifest congressional intent in either the language of the statute or the legisla-

---

[5] Like many other district courts, Judge Coar relied upon Title VII and the ADEA's similarities in finding no preclusion, citing precedent from this court recognizing the two statutes' like- nesses. *Levin I*, 697 F. Supp. 2d at 970. In those cases, we noted the statutes' similar "objectives, substantive prohibi- tions, and legislative histories," *Kelly v. Wauconda Park Dist.*, 801 F.2d 269, 271 (7th Cir. 1986), and recognized that Title VII "is the legislation which most closely parallels the ADEA." *EEOC v. Elrod*, 674 F.2d 601, 607 (7th Cir. 1982).

Although Title VII is certainly useful in interpreting sub- stantive provisions of the ADEA, *see Kelly*, 801 F.2d at 271 (analyzing the ADEA's definition of an "employer"), it is less helpful in this instance. As several sources acknowledge, the remedial provisions of the ADEA, which we focus on in deter- mining exclusivity, differ from those of Title VII. *See, e.g.*, *Ahlmeyer*, 555 F.3d at 1058-59; David C. Miller, *Alone in its Field: Judicial Trend to Hold that the ADEA Preempts § 1983 in Age Discrimination in Employment Claims*, 29 Stetson L. Rev. 573, 593-95 (2000). Title VII's legislative history also speaks explicitly to the issue of § 1983 preclusion, while there is no similar history for the ADEA. *See Trigg*, 766 F.2d at 301 n.3. Thus, Title VII differs in a few significant ways and does not add much to our analysis.

tive history, *Fitzgerald* directs us to compare the rights and protections afforded by the statute and the Constitution. 555 U.S. at 252. We believe the rights and protections afforded by the ADEA and § 1983 equal protection claims diverge in a few significant ways.

First, an ADEA plaintiff may only sue his employer, an employment agency, or a labor organization. *See* 29 U.S.C. § 623. In contrast, a § 1983 plaintiff may file suit against an individual, so long as that individual caused or participated in the alleged deprivation of the plaintiff's constitutional rights. *See Kuhn v. Goodlow*, 678 F.3d 552, 555-56 (7th Cir. 2012). A § 1983 plaintiff may also sue a governmental organization, but only if he can demonstrate that the alleged constitutional violation was "caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with final policymaking authority." *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011) (internal quotation marks omitted). These divergent rights between the ADEA and a § 1983 constitutional claim seriously affect a plaintiff's choice of defendants and his strategy for presenting a prima facie case.

Second, the ADEA expressly limits or exempts claims by certain individuals, including elected officials and certain members of their staff, appointees, law enforcement officers, and firefighters. *See* 29 U.S.C. §§ 623(j), 630(f); *accord Fitzgerald*, 555 U.S. at 257 (no preclusion where some Title IX exemptions could form the basis of equal protection claims). The statutory scheme also

prohibits claims by employees under the age of forty or those bringing so-called "reverse age discrimination" claims. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 593 (2004) ("[T]he text, structure, and history point to the ADEA as a remedy for unfair preference based on relative youth, leaving complaints of the relatively young outside the statutory concern."); *Hamilton v. Caterpillar Inc.*, 966 F.2d 1226, 1228 (7th Cir. 1992). There are no such limitations for § 1983 equal protection claims.

Finally, as a practical matter in light of the Supreme Court's decision in *Kimel*, state employees suing under the ADEA are left without a damages remedy, as such claims are barred by Eleventh Amendment sovereign immunity. 528 U.S. at 91-92. In contrast, "[m]unicipalities do not enjoy any kind of immunity from suits for damages under § 1983." *Benedix v. Vill. of Hanover Park, Ill.*, 677 F.3d 317, 318-19 (7th Cir. 2012) (*citing Owen v. City of Independence, Mo.*, 445 U.S. 622 (1980)). Without the availability of a § 1983 claim, a state employee (like Levin) who suffers age discrimination in the course of his employment is left without a federal damages remedy. *See Mustafa*, 196 F. Supp. 2d at 955 ("[T]he practical effect [of ADEA preclusion] is elimination of all age discrimination claims made against state actors in federal court.").[6]

---

[6] *Mustafa* also notes that, despite *Kimel*, Congress "certainly *intended* to provide a remedy for age discrimination against state employers when it amended the ADEA in 1974." 196 F.

(continued...)

In light of our analysis of the ADEA and the relevant case law, and given these divergent rights and protections, we conclude that the ADEA is not the exclusive remedy for age discrimination in employment claims.

### D. *Qualified Immunity*

Because the ADEA does not preclude Levin's § 1983 equal protection claim, we now turn to the issue of qualified immunity. We review a district court's denial of summary judgment based on qualified immunity *de novo*. *Surita*, 665 F.3d at 868. To determine whether state actors are entitled to qualified immunity, we consider "(1) whether the facts, taken in the light most favorable to the plaintiffs, show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (*citing Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Beyond asserting that the ADEA precludes a § 1983 claim, the Individual Defendants do not challenge the first prong on appeal. Thus, for our purposes, we need only briefly discuss the second prong of the qualified immunity analysis.

"A right is clearly established when, at the time of the challenged conduct, the contours of a right are suf-

---

[6] (...continued)
Supp. 2d at 956. Thus, ADEA exclusivity seems inconsistent with Congress's intent to provide a federal forum for state employees. *Id.*

ficiently clear that every reasonable official would have understood that what he is doing violates that right." *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473-74 (7th Cir. 2011) (internal quotation marks and brackets omitted) (*quoting Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011)). Judge Coar's opinion granted qualified immunity as to Levin's § 1983 equal protection claim, finding that "whether the Seventh Circuit permits equal protection claims for age discrimination in light of the ADEA is unclear." *Levin I*, 697 F. Supp. 2d at 972. Accordingly, Judge Coar believed that the constitutional right was not clearly established and qualified immunity was appropriate. *Id.* On reconsideration, Judge Chang reversed Judge Coar's ruling, noting that "irrational age discrimination is clearly forbidden by the Equal Protection Clause" and the issue of qualified immunity is "not a question concerning whether a particular procedural vehicle (*i.e.*, cause of action) is available." *Levin II*, 2011 WL 2708341, at *12.

We agree with Judge Chang. At the time of the alleged wrongdoing, it was clearly established that age discrimination in employment violates the Equal Protection Clause. *See Kimel*, 528 U.S. at 83. Although age is not a suspect classification, states may not discriminate on that basis if such discrimination is not "rationally related to a legitimate state interest." *Id.* Whether or not the ADEA is the exclusive remedy for plaintiffs suffering age discrimination in employment is irrelevant, and as Judge Chang noted, it is "odd to apply qualified immunity in the context where the procedural uncertainty arises from the fact that Congress created a

statutory remedy for age discrimination that is substantively *broader* than the equal protection clause." *Levin II*, 2011 WL 2708341, at *12. Because Levin's constitutional right was clearly established, the Individual Defendants are not entitled to qualified immunity.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.